# EXHIBIT A

ANNE E. LOPEZ 7609
Attorney General of Hawaiʻi

MELISSA J. KOLONIE 10209
Supervising Deputy Attorney General
WADE H. HARGROVE, III 7897
JOANNA B. K. F. YEH 7764
Deputy Attorneys General
Department of the Attorney General
State of Hawaiʻi
425 Queen Street
Honolulu, Hawaiʻi 96813
Telephone: (808) 587-3050
Facsimile: (808) 587-3077
Email: Wade.H.Hargrove@hawaii.gov

(Additional counsel listed on signature page)

Attorneys for Plaintiff
STATE OF HAWAIʻI

Electronically Filed
FIRST CIRCUIT
1CCV-23-0001612
14-DEC-2023
08:52 AM
Dkt. 2 CMPS

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT
STATE OF HAWAIʻI

| | |
|---|---|
| THE STATE OF HAWAIʻI, ex. rel., ANNE E. LOPEZ, ATTORNEY GENERAL,<br><br>Plaintiff,<br>v.<br><br>3M COMPANY; AGC CHEMICALS AMERICAS, INC.; ARCHROMA U.S., INC.; ARKEMA INC.; BASF CORPORATION; BUCKEYE FIRE EQUIPMENT COMPANY; CHEMDESIGN PRODUCTS, INC.; CHEMGUARD, INC.; CLARIANT CORPORATION; CORTEVA, INC.; DUPONT DE NEMOURS, INC.; DYNAX CORPORATION; EIDP, INC., F/K/A E.I. DU PONT DE NEMOURS AND COMPANY; THE CHEMOURS COMPANY; TYCO FIRE PRODUCTS LP; | CIVIL NO.<br><br>(Other Non-Vehicle Tort)<br><br>COMPLAINT; SUMMONS<br><br>JURY TRIAL DEMANDED<br><br>Trial Date: None.<br><br>(Caption continued on next page) |

and ABC CORPORATIONS 1-10 (Names Fictitious),

Defendants.

**COMPLAINT**

**TABLE OF CONTENTS**

I. NATURE OF ACTION ........ 4
II. THE PARTIES ........ 7
III. JURISDICTION AND VENUE ........ 12
IV. STATUTORY AND REGULATORY BACKGROUND ........ 14
A. Regulation of PFAS ........ 14
B. Hawai‘i’s Unfair and Deceptive Acts and Practices Statute ........ 16
V. FACTUAL ALLEGATIONS ........ 17
A. The Harmful Impacts of PFAS on the Environment, Animals, and Human Health ........ 17
B. Affected Natural Resources ........ 19
C. Defendants’ History of Manufacturing and Selling PFAS-Containing Products, Including AFFF Products ........ 25
D. Defendants Knew, or Should Have Known, That Their PFAS-Containing Products, Including AFFF Products, and Related PFAS Precursors Were Harmful to the Environment and Human Health ........ 28
E. PFAS-Containing Products, Including AFFF Products, Have Resulted in PFAS Contamination in the State, Including Sources of Drinking Water, and Defendants Are Liable for Costs to Remediate and Restore Contaminated Natural Resources ........ 38
F. Old DuPont’s Multi-Step, Years’-Long Fraudulent Scheme to Isolate Its Valuable Tangible Assets from Its PFAS Liabilities ........ 42
G. The Effect of the Years’-Long Conspiracy to Defraud the State and Other Creditors and Avoid Financial Responsibility for Legacy Liabilities ........ 58
VI. CLAIMS ........ 60
COUNT I. Public Nuisance ........ 60
COUNT II. Negligence and Gross Negligence ........ 62
COUNT III. Strict Liability (Design Defect) ........ 64
COUNT IV. Strict Liability (Failure To Warn) ........ 67
COUNT V. Trespass ........ 69
COUNT VI. Unfair and Deceptive Acts or Practices ........ 71
VII. REQUEST FOR RELIEF ........ 73
REQUEST FOR JURY TRIAL ........ 77

## I. NATURE OF ACTION

1. The State of Hawai‘i (“State” or “Hawai‘i”), acting through the Hawai‘i State Attorney General, Anne E. Lopez (“Attorney General”), brings this action pursuant to the State’s statutory and regulatory authority and common law for injuries to the State’s natural resources, property, residents, and consumers against Defendants 3M Company (“3M”); AGC Chemicals Americas, Inc. (“AGC Chemicals”); Archroma U.S., Inc. (“Archroma”); Arkema Inc. (“Arkema”); BASF Corporation (“BASF”); Buckeye Fire Equipment Company (“Buckeye”); ChemDesign Products, Inc. (“ChemDesign”); Chemguard, Inc. (“Chemguard”); Clariant Corporation (“Clariant”); Dynax Corporation (“Dynax”); EIDP, Inc. (“Old DuPont”), f/k/a E. I. du Pont de Nemours and Company; The Chemours Company (“Chemours”); Tyco Fire Products LP (“Tyco”); Corteva, Inc. (“Corteva”); DuPont de Nemours, Inc. (“New DuPont”); and ABC Corporations 1-10 (names fictitious) (collectively, “Defendants”).

2. For decades, Defendants have known of the dangers of toxic per- and polyfluoroalkyl substances, including but not limited to perfluorooctane sulfonic acid (“PFOS”), perfluoroheptanoic acid (“PFHpA”), perfluorooctanoic acid (“PFOA”), perfluorohexane sulfonic acid (“PFHxS”), perfluorodecanoic acid (“PFDA”), perfluorononanoic acid (“PFNA”), perfluorobutane sulfonic acid (“PFBS”), and hexafluoropropylene oxide dimer acid (“HFPO-DA,” known colloquially as “GenX”) (collectively, “PFAS”). Accordingly, Defendants have known of the dangers of the PFAS in aqueous film-forming foam (“AFFF”) used for firefighting training and emergency response at military and industrial facilities, airports, and other locations throughout the State, and in consumer products, including personal, family, and household products like Stainmaster®, Scotchgard™, and Teflon® (collectively, “PFAS-containing Products”).

3. Despite this knowledge, Defendants chose to not take steps to reduce those risks and instead continued to advertise, market, manufacture for sale, offer for sale, and sell PFAS-containing Products, including AFFF Products (defined as AFFF and related fluorochemicals and fluorosurfactants) to, inter alia, State and local government, businesses, and consumers so that Defendants could reap enormous profits. Now that the State and the larger public are becoming aware of just some of the massive problems Defendants have created while enriching themselves, Defendants seek to foist the equally enormous costs to address those problems back on the victims of their concealment.

4. The U.S. Environmental Protection Agency ("EPA") claims to have identified more than 12,000 PFAS compounds and has concluded that exposure to PFAS may lead to significant negative health effects, including but not limited to decreased fertility; preeclampsia and high blood pressure in pregnant women; adverse developmental effects in children such as low birth weight, accelerated puberty, bone variations, and behavioral changes; increased risk of certain cancers, including kidney and testicular cancers; reduced ability of the body's immune system to fight infections, including reduced vaccine response; interference with the body's natural hormones; ulcerative colitis; thyroid disease; and medically diagnosed high cholesterol and/or risk of obesity.

5. Defendants knew that their PFAS-containing Products, including AFFF Products, would release PFAS into the environment, harm people and natural resources, and require enormous costs to remediate, but they concealed information about the chemicals' negative health effects and affirmatively contradicted such information in public statements and marketing campaigns in order to reap vast profits.

6. Defendants' tortious, deceptive, and unlawful actions have caused and/or contributed to significant known PFAS contamination of the State's air, soil, sediment, biota, surface water, groundwater, drinking water, watercourses, wetlands, other natural resources, and property held in trust or otherwise owned by the State. These toxic and persistent "forever chemicals" are contaminating countless water supplies and are requiring or will require massive effort and expense to investigate, treat, and remediate the contamination of the State's natural resources, property held in trust by the State, and/or property otherwise owned by the State and to supply potable water to large numbers of people in the State.

7. Despite expending significant public resources to study the nature and extent of existing PFAS contamination in the State, the State has only just begun to understand the extent of the problem, and its understanding of the PFAS problem continues to grow. Addressing the PFAS emergency that Defendants have caused requires substantial effort and expense to investigate, treat, and remediate the contamination. The Defendants who created and profited from the creation of this problem must pay to address the PFAS contamination throughout the State.

8. Many locations in the State have been identified as being contaminated with PFAS caused by Defendants' PFAS-containing Products, including AFFF Products. For example, samples of drinking water from Kunia Village, Oʻahu, contained PFOS levels as high as 50 parts per trillion ("ppt")—12.5 times higher than the proposed federal maximum contaminant level of 4 ppt.

9. Moreover, Joint Base Pearl Harbor-Hickam underwent a Site Investigation in 2022, the results of which indicated PFAS contamination, likely caused by the use of Defendants' AFFF Products, far exceeding EPA's Health Advisory values. By today's standards, the maximum concentration of PFOS measured at the base would be approximately 655,000 times higher than

what EPA considers health-protective. Daniel K. Inouye International Airport (formerly Honolulu International Airport), Kahului Airport, and Ellison Onizuka Kona International Airport are likewise contaminated as a result of AFFF, with concerning levels of PFAS detected near fire training areas, fire stations, hangars, and runways.

10. Studies of indoor air and house dust indicate exposure to PFAS from products used for household purposes, such as carpet cleaners, nonstick cookware, packaged fast food, and waterproof clothing.[1] Defendants misrepresented or failed to disclose the health risks and environmental degradation arising from use and disposal of their PFAS-containing Products, depriving consumers of the opportunity to make informed decisions about their health and the health of their families in choosing consumer products for purchase.

11. For the reasons set forth herein, the State seeks to hold Defendants accountable for the harm they have caused, and continue to cause, to Hawai‘i and its residents.

## II. THE PARTIES

12. The State brings this action as an exercise of its authority and inherent police powers to protect public trust resources, which includes but is not limited to its power to prevent pollution of the State’s property and waters of the State; to prevent and abate nuisances; and to prevent and abate hazards to public health, safety, welfare, and the environment. The Attorney

---

[1] *See, e.g.*, ATSDR, *PFAS Chemical Exposure* (2022), https://www.atsdr.cdc.gov/pfas/health-effects/exposure.html; HAWAI‘I DEPARTMENT OF HEALTH, *PFAS General Factsheet* (2023), https://health.hawaii.gov/heer/files/2023/01/PFAS-Factsheet-1-General-Final-01.17.2023.pdf; WASHINGTON STATE DEPARTMENT OF ECOLOGY & WASHINGTON STATE DEPARTMENT OF HEALTH, *Per- and Polyfluoroalkyl Substances Chemical Action Plan* (Rev. 2022), https://apps.ecology.wa.gov/publications/documents/2104048.pdf; Mark J. Strynar & Andrew B. Lindstrom, *Perfluorinated Compounds in House Dust from Ohio and North Carolina, USA*, 42 ENV’T SCI. TECH. 3751 (2008), https://pubs.acs.org/doi/10.1021/es7032058; Tina Savvaides et al., *Prevalence and Implications of Per- and Polyfluoroalkyl Substances (PFAS) in Settled Dust*, CURRENT ENV’T HEALTH REPS. 8:323–35 (2021), https://doi.org/10.1007/s40572-021-00326-4.

General has authority to bring this lawsuit. *See* Hawai‘i Revised Statutes (“HRS”) §§ 661-10, 28-1, 28-2, 480-3.1.

13. The State also brings this suit in its parens patriae capacity for the benefit of the citizens of the State.

14. This action is also brought pursuant to the State’s possessory interest in the public property and public lands of the State.

15. Defendant 3M Company (“3M”) is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 3M Center, St. Paul, Minnesota 55144. 3M has designed, manufactured, marketed, promoted, distributed, and/or sold PFAS-containing Products that were used and/or disposed of in the State. 3M is registered to do business in Hawai‘i.

16. Defendant AGC Chemicals Americas, Inc. (“AGC Chemicals”) is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 5 East Uwchlan Avenue, Suite 201, Exton, Pennsylvania 19341. AGC Chemicals is the North American subsidiary of AGC Inc. (f/k/a Asahi Glass Co., Ltd.). AGC Chemicals and/or its affiliates have designed, manufactured, marketed, promoted, distributed, and/or sold PFAS used to manufacture PFAS-containing Products that were used and/or disposed of in the State.

17. Defendant Archroma U.S., Inc. (“Archroma”) is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 5435 77 Center Drive, Suite 10, Charlotte, North Carolina 28217. Archroma, a subsidiary of Archroma Management, LLC, has designed, manufactured, marketed, promoted, distributed, and/or sold PFAS used to manufacture PFAS-containing Products that were used and/or disposed of in the State. On information and belief, Archroma is a successor to Clariant, which manufactured

fluorochemicals used in AFFF and was formerly known as Sandoz Chemicals Corporation and as Sodeyeco, Inc.

18. Defendant Arkema Inc. ("Arkema") is a corporation organized and existing under the laws of the State of Pennsylvania, with its principal place of business located at 900 First Avenue, King of Prussia, Pennsylvania 19406. Arkema is a successor in interest to Atochem North America Inc.; Elf Atochem North America, Inc.; and Atofina Chemicals, Inc. Arkema and/or its predecessors have designed, manufactured, marketed, promoted, distributed, and/or sold PFAS used to manufacture PFAS-containing Products that were used and/or disposed of in the State.

19. Defendant BASF Corporation ("BASF") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 100 Park Avenue, Florham Park, New Jersey 07932. On information and belief, BASF is the successor in interest to Ciba Inc. (f/k/a Ciba Specialty Chemicals Corporation). On information and belief, Ciba Inc. designed, manufactured, marketed, promoted, distributed, and/or sold PFAS used to manufacture PFAS-containing Products that were used and/or disposed of in the State. BASF is registered to do business in Hawaiʻi.

20. Defendant Buckeye Fire Equipment Company ("Buckeye") is a corporation organized and existing under the laws of the State of Ohio, with its principal place of business located at 110 Kings Road, Kings Mountain, North Carolina 28086. Buckeye has designed, manufactured, marketed, promoted, distributed, and/or sold PFAS-containing Products that were used and/or disposed of in Hawaiʻi.

21. Defendant ChemDesign Products, Inc. ("ChemDesign") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at Two Stanton Street, Marinette, Wisconsin 54143. On information and belief, ChemDesign

designed, manufactured, marketed, promoted, distributed, and/or sold PFAS used to manufacture PFAS-containing Products, primarily to Chemguard, that were used and/or disposed of in Hawaiʻi.

22. Defendant Chemguard, Inc. ("Chemguard") is a corporation organized and existing under the laws of the State of Texas, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143. Chemguard has designed, manufactured, marketed, promoted, distributed, and/or sold PFAS-containing Products that were used and/or disposed of in the State and also has designed, manufactured, marketed, and sold PFAS used to manufacture PFAS-containing Products that were used and/or disposed of in Hawaiʻi.

23. Defendant Clariant Corporation ("Clariant") is a corporation organized and existing under the laws of the State of New York, with its principal place of business located at 500 East Morehead Street, Suite 400, Charlotte, North Carolina 28202. Clariant has designed, manufactured, marketed, promoted, distributed, and/or sold PFAS used to manufacture PFAS-containing Products that were used and/or disposed of in the State. Clariant is a predecessor to Archroma and was formerly known as Sandoz Chemicals Corporation and as Sodeyeco, Inc.

24. Defendant Corteva, Inc. ("Corteva") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. In 2019, New DuPont spun off a new, publicly traded company, Corteva, which currently holds Old DuPont as a subsidiary. In connection with these transfers, Corteva contractually assumed certain Old DuPont liabilities—including those relating to PFAS. New DuPont does business throughout the United States, including in Hawaiʻi. Corteva is registered to do business in Hawaiʻi.

25. Defendant DuPont de Nemours, Inc. ("New DuPont"), f/k/a DowDuPont Inc., is a corporation organized and existing under the laws of the State of Delaware, with its principal place

of business located at 974 Centre Road, Wilmington, Delaware 19805. In 2015, after Old DuPont spun off Chemours, Old DuPont merged with The Dow Chemical Company and transferred Old DuPont's historic liabilities and assets to other entities, including New DuPont. In connection with these transfers, New DuPont assumed certain Old DuPont liabilities—including those relating to PFAS. New DuPont does business throughout the United States, including in Hawaiʻi.

26. Defendant Dynax Corporation ("Dynax") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 79 Westchester Avenue, Pound Ridge, New York 10576. Dynax has designed, manufactured, marketed, promoted, distributed, and/or sold PFAS used to manufacture PFAS-containing Products that were used and/or disposed of in Hawaiʻi.

27. Defendant EIDP, Inc. ("Old DuPont"), f/k/a E. I. du Pont de Nemours and Company, is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. Old DuPont has designed, manufactured, marketed, promoted, distributed, and/or sold PFAS used to manufacture PFAS-containing Products that were used and/or disposed of in the State. Old DuPont is registered to do business in Hawaiʻi.

28. Defendant The Chemours Company ("Chemours") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899. In 2015, Old DuPont spun off its performance chemicals business to Chemours, along with vast environmental liabilities. Chemours has designed, manufactured, marketed, promoted, distributed, and/or sold PFAS used to manufacture PFAS-containing Products, that were used and/or disposed of in Hawaiʻi. Chemours is registered to do business in Hawaiʻi.

29. Defendant Tyco Fire Products LP ("Tyco") is a limited partnership organized and existing under the laws of the State of Delaware, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143. Tyco manufactures the Ansul brand of products and is the successor in interest to Ansul Company (together, "Tyco/Ansul"). Tyco/Ansul has designed, manufactured, marketed, promoted, distributed, and/or sold PFAS-containing Products that were used and/or disposed of in the State and has also designed, manufactured, marketed, and sold PFAS used to manufacture PFAS-containing Products that were used and/or disposed of in Hawaiʻi.

30. Defendants ABC Corporations 1 through 10, unknown at this time, are manufacturers of PFAS-containing Products, including AFFF Products, manufacturers of PFAS used to make PFAS-containing Products, including AFFF Products, and/or distributors of PFAS-containing Products, including AFFF Products, that have caused injuries to the State's natural resources or otherwise share responsibility for such injuries. When these ABC Corporations are identified, they will be added by name.

31. Defendants 3M, AGC Chemicals, Archroma, Arkema, BASF, Buckeye, ChemDesign, Chemguard, Clariant, Dynax, Old DuPont, Chemours, Tyco, Corteva, New DuPont, and ABC Corporations 1 through 10 are collectively referred to herein as "Defendants."

## III. JURISDICTION AND VENUE

32. This Court has subject-matter jurisdiction over this civil action pursuant to HRS § 603-21.5(a)(3). The natural resources that are the subject of this suit are all within the State of Hawaiʻi. The State of Hawaiʻi is not a citizen of any state for diversity purposes, and thus no diversity jurisdiction exists as a basis for federal jurisdiction. No federal subject-matter jurisdiction is invoked herein.

33. This Court has personal jurisdiction over Defendants because they either are domiciled in Hawai‘i; were served with process in Hawai‘i; are organized under the laws of Hawai‘i; maintain their principal place of business in Hawai‘i; transact business in Hawai‘i; perform work in Hawai‘i; contract to supply goods, manufactured products, or services in Hawai‘i; caused tortious injury in Hawai‘i; engage in persistent courses of conduct in Hawai‘i; derive substantial revenue from manufactured goods, products, or services used or consumed in Hawai‘i; and/or have interests in, use, or possess real property in Hawai‘i. This Court has personal jurisdiction over Defendants pursuant to HRS § 634-35 because, inter alia, the causes of action arise from and/or relate to Defendants' transaction of business within this State and commissions of tortious acts within this State. As described above and throughout the remaining allegations in this Complaint, each Defendant named here maintains sufficient minimum contacts with the State and does or has purposefully directed activities toward this State and/or purposefully availed itself of the privileges and obligations of conducting business in this State at relevant times such that this Court's exercise of jurisdiction over it is reasonable and consistent with the Constitution and laws of the United States. Among other relevant factors, Hawai‘i has a paramount interest in having this dispute adjudicated in the courts of this State.

34. Venue is proper in the First Circuit pursuant to HRS § 603-36(5) because some part of the property that is subject to the action is located in the First Circuit and because some part of the cause of action arose there. Property contaminated by Defendants' PFAS-containing Products, including AFFF Products, is located throughout the State, including in the First Circuit. The injuries caused by Defendants' conduct have been inflicted throughout the State, including the First Circuit. The property and injury in question includes but is not limited to water, wildlife, and

land, including those within the First Circuit. Defendants' PFAS-containing Products, including AFFF Products, were sold and used in the First Circuit.

## IV. STATUTORY AND REGULATORY BACKGROUND

### A. Regulation of PFAS

35. PFAS are subject to federal regulation.

36. For example, with respect to PFAS in drinking water: (1) in March 2021, EPA issued a final determination to regulate PFOA and PFOS as contaminants pursuant to the Safe Drinking Water Act ("SDWA"), 42 U.S.C. §§ 300f, *et seq.*; (2) in December 2021, EPA published the final fifth Unregulated Contaminant Monitoring Rule, which will require public water systems around the country to monitor for 29 PFAS compounds between 2023 and 2025; (3) in June 2022, EPA issued interim health advisory levels for PFOA at 0.004 ppt, for PFOS at 0.02 ppt, and for HFPO-DA at 10 ppt; and (4) in March 2023, EPA released proposed maximum contaminant levels ("MCLs") for PFOA, PFOS, PFNA, PFHxS, PFBS, and HFPO-DA in drinking water pursuant to the SDWA. Once adopted as a final rule, the MCLs will require public water systems across the United States to monitor for these PFAS, notify the public of detections, and take action to remove PFAS concentrations above those levels.

37. Additionally, with respect to remediation of contaminated sites: (1) in October 2021, EPA announced important steps toward evaluating the existing data for four PFAS compounds pursuant to the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901 *et seq.*, and strengthening the ability to clean up PFAS contamination across the country through the RCRA corrective action process; (2) in May 2022, EPA added five PFAS compounds to a list of risk-based values for site cleanups known as Regional Screening Levels and Regional Remedial Management Levels; (3) in August 2022, EPA issued a proposed rule that would designate PFOA and PFOS as

"hazardous substances" pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 *et seq*.; (4) in April 2023, EPA issued an Advance Notice of Proposed Rulemaking asking the public for input regarding potential future hazardous substance designations of additional PFAS compounds under CERCLA.

38. With respect to use of PFAS in products and processes: (1) in January 2023, EPA proposed a rule pursuant to the Toxic Substances Control Act ("TSCA"), 15 U.S.C. §§ 2601 *et seq*., that would prevent anyone from starting or resuming, without a complete EPA review and risk determination, the manufacture, processing, or use of an estimated 300 PFAS that have not been made or used for many years, known as "inactive PFAS"; and (2) in September 2023, EPA finalized a rule pursuant to TSCA that requires manufacturers and importers to submit information to EPA about the use, volume, byproducts, disposal, exposure, and environmental and health effects of PFAS.

39. With respect to PFAS in discharges of wastewater: (1) in December 2022, EPA issued a memorandum providing guidance to states on how to use the National Pollutant Discharge Elimination System permitting program of the Federal Water Pollution Control Act (a/k/a the Clean Water Act), 33 U.S.C. §§ 1251 *et seq*., to reduce harmful PFAS pollution; and (2) in January 2023, EPA released its final Effluent Limitations Guidelines ("ELGs") Plan 15, including a determination that revised ELGs and pretreatment standards are warranted for reducing PFAS in leachate discharges from landfills, an announcement of an expansion of the ongoing study of PFAS discharges from textile manufacturers, and a new study of waste streams to wastewater treatment plants.

40. With respect to reporting releases of PFAS to the environment, in December 2022, EPA proposed a rule that would improve reporting PFAS to the Toxics Release Inventory ("TRI") by, among other proposed changes, eliminating an exemption that allows facilities to avoid

reporting information on PFAS when those chemicals are used in small, or de minimis, concentrations. Because PFAS are used at low concentrations in many products, this rule would ensure that covered industry sectors and federal facilities that make or use TRI-listed PFAS will no longer be able to rely on the de minimis exemption to avoid disclosing their PFAS releases and other waste management quantities for these chemicals.

41. In addition, the Hawai‘i Hazard Evaluation and Emergency Response Office has established environmental action levels (“EALs”) for 20 PFAS compounds, including PFOS, PFOA, PFHxA, PFHxS, PFDA, PFNA, PFBS, and HFPO-DA. As of April 2023, the EALs for groundwater that is or may become a source of drinking water are 7.7 ppt for PFOS and 12 ppt for PFOA. The EALs for PFBS, PFHxS, PFNA and HFPO-DA closely align with EPA’s latest proposed Maximum Contaminant Level Goals.

42. The EALs reflect risk factors such as drinking water toxicity, aquatic toxicity, ecotoxicity and food chain uptake, environmental mobility, aquatic habitat impacts, and carcinogenic effects.

## B. Hawai‘i’s Unfair and Deceptive Acts and Practices Statute

43. Hawai‘i’s Unfair and Deceptive Acts and Practices statute (“UDAP”), HRS Chapter 480, makes unlawful any unfair or deceptive trade practices in the conduct of any trade or commerce. HRS § 480-2(a).

44. UDAP empowers the Attorney General to bring a civil action on behalf of the State whenever a “person, firm, company, association, or corporation” violates its terms. HRS § 480-3.1.

45. The Attorney General is responsible for UDAP’s enforcement. HRS § 480-20.

46. The Attorney General has broad authority to enforce the provisions of UDAP. Whenever the State is injured “in its business or property by reason of anything forbidden or

declared unlawful by this chapter, it may sue to recover threefold the actual damages sustained by it, whether directly or indirectly. The attorney general may bring an action on behalf of the State . . . to recover the damages provided for by this section[.]" HRS § 480-14(a). In addition, "[t]he attorney general may bring proceedings to enjoin any violation" of UDAP. HRS § 480-15.

## V. FACTUAL ALLEGATIONS

### A. The Harmful Impacts of PFAS on the Environment, Animals, and Human Health

47. PFAS, including but not limited to PFOS, PFOA, PFHxS, PFNA, PFHpA, PFDA, PFBS, and GenX chemicals, have characteristics that cause extensive and long-lasting environmental contamination.

48. The use and disposal of PFAS-containing Products result in PFAS migrating into the environment. For example, landfills receive sewage sludge, waste from cleanup of contaminated sites, and consumer goods—all of which contain PFAS. PFAS from the waste disposed of in unlined landfills may leach into groundwater, surface water, and soils, then migrate to and impact other natural resources, including but not limited to marine sediments and biota. PFAS also can be released from disposal sites into the air in the form of dust.

49. Wastewater treatment systems in Hawaiʻi receive wastewater that contains PFAS from a variety of sources, including landfill leachate, sites contaminated with AFFF Products, and shedding from PFAS-containing Products. Treatment units at conventional wastewater treatment plants generally do not remove PFAS efficiently. Moreover, almost 40 percent of Hawaiʻi residents are served by smaller, decentralized Individual Wastewater Systems that provide lower levels of treatment than wastewater treatment plants. When wastewater is not treated to specifically remove PFAS, pollutants like PFAS enter nearby coastal waters, surface water, and groundwater, where they can contaminate water sources.

50. AFFF is a PFAS-containing fire-suppressing foam used to extinguish flammable liquid fires, including jet-fuel fires, aviation-related fires, hangar fires, ship fires, and chemical fires and is routinely used to train firefighters and test firefighting equipment.

51. When used as intended during a firefighting event or training exercise, AFFF Products can cause hundreds, if not thousands, of gallons—per application—of foamy water laced with PFAS to enter the environment in a variety of ways, including but not limited to through direct application or discharge to soils, sediment, surface water, and groundwater.

52. PFAS are highly fluorinated synthetic chemical compounds that include carbon chains containing at least one carbon atom on which some or all hydrogen-carbon bonds are replaced by carbon-fluorine bonds. The carbon-fluorine bond is one of the strongest bonds in chemistry and gives PFAS their unique chemical properties. The carbon-fluorine bond in PFAS generally does not occur in nature.

53. PFAS are mobile and persist in the environment. Once introduced into the environment, PFAS quickly spread because they easily dissolve in water and, thus, have reached numerous water systems within the State. PFAS also persist in the environment indefinitely because of their multiple carbon-fluorine bonds, which are resistant to metabolic and environmental degradation processes.

54. PFAS bioaccumulate and biopersist in animals and are toxic to their health. Because several PFAS, including PFOS and PFOA, are very slowly excreted from individual organisms, ongoing low-level exposure results in a buildup of PFAS within the body. Thus, they also can biomagnify, meaning that their concentration in organic tissue increases as they are consumed up the food chain. PFAS are also harmful to the environment and animal health.

55. PFAS are toxic and cause significant adverse effects to human health. The presence of these chemicals in drinking water presents a serious threat to public health. For example, PFOS exposure is associated with numerous adverse health effects in humans, including increases in serum lipids (i.e., medically diagnosed high cholesterol); decreases in antibody response to vaccines; increases in risk of childhood infections; and adverse reproductive and developmental effects, along with pregnancy induced hypertension and preeclampsia. PFOA exposure is associated with, among other things, decreased birthweight, testicular and kidney cancers, ulcerative colitis, medically diagnosed high cholesterol, and thyroid disease.

56. Removal of PFAS from drinking water sources requires specialized, and expensive, drinking water treatment systems. Additionally, once PFAS are removed from drinking water, they must be disposed of in a safe manner, which is costly and creates new risks.

57. In short, once PFAS are used, they are inevitably released to and then migrate through the environment, resist natural degradation, contaminate groundwater and drinking water, damage human and animal life, and are difficult and costly to remove.

## B. Affected Natural Resources

58. For centuries, water has played a critical role in Native Hawaiian society and traditional and customary practices, and has been recognized as the source of all life in Hawaiʻi.[2] The importance of water in Hawaiʻi is embodied in the phrase *ola i ka wai* (water is life).[3]

59. As stated in the Hawaiʻi Constitution, "[a]ll public natural resources are held in trust by the State for the benefit of the people." Haw. Const. art. XI, § 1.

---

[2] D. Kapuaʻala Sproat, *From Wai to Kānāwai: Water Law in Hawaiʻi*, *in* NATIVE HAWAIIAN LAW: A TREATISE 522, 526 (Melody Kapilialoha MacKenzie, Susan K. Serrano & D. Kapuaʻala Sproat eds., 2015).

[3] *Id.*

60. The State is charged with "conserv[ing] and protect[ing] Hawaii's natural beauty and all natural resources, including land, water, air, minerals and energy sources." Haw. Const. art. XI, § 1. To fulfill its obligation, the State has "the power to promote and maintain a healthful environment." Haw. Const. art. IX, § 8.

61. Each person in Hawai'i has "the right to a clean and healthful environment, . . . including control of pollution and conservation, protection and enhancement of natural resources." Haw. Const. art. XI, § 9. Therefore, it is the policy of the State to "conserve the natural resources, so that land, water, mineral, visual, air and other natural resources are protected by controlling pollution, by preserving or augmenting natural resources, and by safeguarding the State's unique natural environmental characteristics[.]" HRS § 344–3(1).

62. The State has the "obligation to protect, control and regulate the use of Hawaii's water resources for the benefit of its people." Haw. Const. art. XI, § 7. This is codified in the State Water Code, HRS Chapter 174C, which "recognize[s] that the waters of the State are held for the benefit of the citizens of the State . . . [who] are beneficiaries and have a right to have the waters protected for their use." HRS § 174C-2(a).

63. Further, "[t]he State reaffirms and shall protect all rights, customarily and traditionally exercised for subsistence, cultural and religious purposes and possessed by ahupua'a tenants who are descendants of native Hawaiians who inhabited the Hawaiian Islands prior to 1778 . . . ." Haw. Const. art. XII, § 7.

64. PFAS in PFAS-containing Products, including AFFF Products, have injured and continue to injure these natural resources.

65. PFAS attributable to PFAS-containing Products have been found in groundwater, surface water, sediments, and soils in the State where AFFF Products were used, stored, disposed of, or otherwise discharged.

66. Contamination from PFAS attributable to PFAS-containing Products persists in the State's natural resources (i.e., it does not break down in the environment); damages their intrinsic value; and impairs the public benefits derived from access to, use, and enjoyment of Hawai'i's natural resources.

67. The current and future residents of the State have a substantial interest in having natural resources uncontaminated by PFAS, as do the agriculture, aquaculture, tourism, recreation, and other industries that rely upon a clean environment.

**i. Groundwater**

68. Groundwater is a critical ecological natural resource for the people of the State, as the State relies on groundwater for drinking, irrigation, and domestic, commercial, and industrial activities.

69. The Hawaiian Islands, located well over 2,000 miles from the nearest continent, are reliant on precipitation stored in aquifers to meet drinking water and all other freshwater needs.

70. Groundwater flows into drinking water wells, streams, and the ocean, which impacts beaches and coral reefs.

71. Groundwater provides approximately 99 percent of Hawai'i's domestic water and about 50 percent of all freshwater used in the State. It is the principal source of municipal water supplies in Hawai'i.

72. Hawai‘i's groundwater is also used for irrigation, agriculture, and industry. For example, Hawai‘i is a major producer of macadamia nuts, which is an important source of income for the State's economy.

73. Groundwater provides base flow to streams and influences surface water quality, wetland ecological conditions, and the health of aquatic ecosystems. In addition to serving as a source of water for drinking, agriculture, and other uses, groundwater is an integral part of the overall ecosystem in the State. Groundwater keeps water in rivers during times of drought. When there is little rain, aquatic species rely on groundwater to support stream flow, modulate temperatures, and regulate nutrients.

74. Groundwater promotes cycling and nutrient movement within and among the State's waters, prevents saltwater intrusion, provides groundwater stabilization, and helps to maintain critical water levels in streams.

75. AFFF Products are a significant source of PFAS contamination in groundwater, as they mobilize in and through groundwater sources to reach areas beyond the location of the AFFF Products' use. This contamination has had and will continue to have severe and adverse effects on the State's groundwater.

76. Investigations in the State have revealed elevated levels of PFAS in the groundwater. Investigation of PFAS contamination in groundwater in the State is ongoing.

**ii. Surface Water**

77. Surface water is a critical resource of the State. In Hawai‘i, there are approximately 376 perennial streams, primarily fed by rainfall and groundwater.

78. Streams are a vital part of the State's ecosystem. They provide habitats for native fish and wildlife, support various recreational activities such as swimming and fishing, and maintain wetland and estuary ecosystems.

79. The fresh water provided by Hawai'i's streams is essential to traditional and customary Hawaiian rights and practices, including aquaculture and *kalo* (taro) cultivation.

80. Tourism and recreation, which are dependent on clean water, are a significant part of the State's economy. Tourism accounts for just under a quarter of the State's economy. In 2019, tourism generated over $16 billion in revenue.

81. Surface water also provides aesthetic and ecological value, including supporting aquatic ecosystems, nearby communities, and the residents of the State.

82. Streams support the diverse ecosystems of Hawai'i, from rainforests to coastal areas. Many species of fish, crabs, shrimp, and seaweed require fresh water to reproduce. Some species migrate from the ocean directly into streams, moving upstream into the plains and mountains.

83. PFAS are mobile in water and can spread great distances from the point of discharge. PFAS contamination attributable to the use of PFAS-containing Products, including AFFF Products, in the State has reached and contaminated surface water throughout Hawai'i.

84. Investigation of PFAS contamination in surface water in the State is ongoing.

**iii. Sediments, Soils, and Watercourses**

85. The State's sediments, soils, and watercourses are critical components of the State's complex ecological resources. Sediments, soils, and watercourses sustain a wide diversity of plants and animals that are essential to a healthy ecosystem. They provide a living substrate for

submerged and emergent flora, which in turn support diverse invertebrate species, wading birds, and fish and shellfish populations.

86. Hawai‘i's fertile soil nurtures crops like *kalo*, *‘ulu* (breadfruit), *‘uala* (sweet potato), *kō* (sugarcane), pineapples, coffee, and macadamia nuts.

87. Sediments and soils serve as a long-term reservoir of PFAS, where PFAS are stored and released over time, impacting biota and increasing PFAS concentrations in fish tissue, other wildlife, and plants.

88. PFAS contamination caused by the use, storage, disposal, and discharge of PFAS-containing Products, including AFFF Products, in the State has reached and adversely affected soil and sediment throughout Hawai‘i. Additionally, PFAS in the soil column serve as a continuing source of contamination of groundwater and other natural resources of the State. PFAS in sediments, as well as surface water, increase PFAS concentrations in fish.

89. Investigation of PFAS contamination in sediments, soils, and watercourses in the State is ongoing.

**iv. Biota**

90. Biota, including the State's flora and fauna, are critical ecological resources. The State's biodiversity provides valuable ecological, social, and economic goods and services and is an integral part of the ecological infrastructure for all cultural and economic activity in the State.

91. With more than 10,000 unique species in the State, Hawai‘i's overall species diversity is among the highest in the United States. At the same time, Hawai‘i is home to more than one-third of the birds and plants on the U.S. Endangered Species List.

92. PFAS contamination can cause damage to the liver and immune system in animals and has been shown to damage cell structure and organelle functions in plants.

93. Natural resource injuries to biota in the State negatively affect not only the individual species directly involved, but also the capacity of the injured ecosystems to regenerate and sustain life in the future.

94. PFAS contamination attributable to Defendants' PFAS-containing Products has reached and adversely affected biota in the State. The Hazardous Evaluation and Emergency Response Office of the Hawai‘i Department of Health reports that PFAS have been found in sea turtles, whales, dolphins, and Hawaiian monk seals around the State.

95. Investigation of PFAS contamination in biota in the State is ongoing.

**C. Defendants' History of Manufacturing and Selling PFAS-Containing Products, Including AFFF Products**

96. 3M began to produce PFOS and PFOA by electrochemical fluorination in the 1940s. In the 1960s, 3M used its fluorination process to develop PFAS-containing Products such as Scotchgard™ and AFFF Products.

97. 3M manufactured, marketed, and sold AFFF from the 1960s to the early 2000s. Tyco/Ansul began to manufacture, market, and sell AFFF in the 1970s. Chemguard began to manufacture, market, and sell AFFF in the 1990s. Buckeye began to manufacture, market, and sell AFFF in the 2000s.

98. Arkema's predecessors supplied fluorosurfactants (e.g., PFOA) used to manufacture AFFF beginning in the 1970s. Ciba Corporation ("Ciba") supplied fluorosurfactants used to manufacture AFFF beginning in the 1970s. Dynax supplied fluorosurfactants used to manufacture AFFF beginning in the 1990s. Old DuPont acquired Arkema's predecessors' fluorosurfactants business in 2002, after which it supplied fluorosurfactants used to manufacture AFFF. Chemguard acquired Ciba's fluorosurfactants business in 2003, after which it supplied fluorosurfactants used

to manufacture AFFF. Following Chemours's spinoff from Old DuPont, Chemours supplied fluorosurfactants used to manufacture AFFF.

99. At varying times, AGC Chemicals, Clariant, and Old DuPont supplied fluorochemicals used to make AFFF.

100. From the 1960s through 2001, the U.S. Department of Defense purchased AFFF exclusively from 3M and Tyco/Ansul.

101. In 2000, 3M announced it was phasing out its manufacture of PFOS, PFOA, and related PFAS-containing Products, including AFFF. In communications with EPA at that time, 3M stated that it had "concluded that . . . other business opportunities were more deserving of the company's energies and attention." In its press release announcing the phase-out, 3M stated "our products are safe" and that 3M's decision was "based on [its] principles of responsible environmental management." 3M further stated that "the presence of these materials at . . . very low levels does not pose a human health or environmental risk." 3M made no mention in its press releases or regulatory statements of the risks to human health and the environment posed by the chemicals, although those risks were well-known to it at the time.

102. After 3M exited the AFFF market, other Defendants continued to manufacture and sell AFFF Products that contained PFAS. Indeed, Old DuPont saw an opportunity to grab a larger share of the AFFF market when 3M exited, although Old DuPont had decades of evidence that PFAS were highly toxic and dangerous to the environment and human health.

103. Defendants advertised, offered for sale, and sold AFFF Products to federal, state, and territory government entities, including the military, counties, municipalities, airports, fire departments, and/or other governmental or quasi-governmental entities, for use in the State.

104. 3M's AFFF Products were created using an electrochemical fluorination process and contain PFAS. The remaining Defendants' AFFF Products, were created using a telomerization process and contain or break down into PFOA. AFFF Products manufactured by Defendants other than 3M are fungible and lack traits that would make it possible to identify the product as being manufactured, distributed, or sold by a particular Defendant. Due to this fungibility, Defendants are in the best position to identify the original manufacturer of the AFFF Products released at any particular site. Any inability of the State to identify the original manufacturer of the specific AFFF Products released into the State's natural resources in particular instances at particular sites is a result of the fungible nature of the products and not as a result of any action or inaction by the State.

105. Defendants knew their customers stored large stockpiles of AFFF Products. In fact, Defendants marketed their AFFF Products by promoting their long shelf life. Even after Defendants fully understood the toxicity of PFAS—and their injurious impacts when released into the environment through use of AFFF Products exactly as Defendants had marketed and intended for them to be used—Defendants concealed the true harmful nature of PFAS. Even while Defendants phased out production or transitioned to other formulas, they did not advise their customers that they should not use PFAS-containing Products, including AFFF Products, or otherwise reveal the dangers posed by PFAS-containing Products.

106. Defendants further did not attempt to remove their harmful products from the market. Defendants did not warn the State or consumers that the use of PFAS-containing Products, including AFFF Products, would harm the environment, endanger human health, or result in substantial costs to investigate and clean up groundwater contamination and damage to other natural resources.

107. Accordingly, for many years after their original sale, AFFF Products were still being applied directly to the ground and washed into sediments, soils, and waters of the State, harming the environment and endangering human health. Defendants never advised their customers that they needed to properly dispose of their stockpiles of AFFF Products, and they did not advise them on how to properly dispose of AFFF Products.

108. PFAS from PFAS-containing Products like Scotchgard™ are still released into the environment today.

### D. Defendants Knew, or Should Have Known, That Their PFAS-Containing Products, Including AFFF Products, and Related PFAS Precursors Were Harmful to the Environment and Human Health

#### i. 3M Knew, or Should Have Known, of the Harm Caused by PFAS, and 3M Concealed Negative Information About These Chemicals from Regulators and Users of PFAS-Containing Products, Including AFFF Products

109. 3M has known for decades that the PFAS in its PFAS-containing Products, including AFFF Products, are toxic and adversely affect the environment and human health.

110. By 1956, 3M's PFAS were found to bind to proteins in human blood, resulting in bioaccumulation of those compounds in the human body.

111. 3M knew as early as 1960 that its PFAS waste could leach into groundwater and otherwise enter the environment. An internal 3M memorandum from 1960 described 3M's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells."

112. As early as 1963, 3M knew that its PFAS were highly stable in the environment and did not degrade after disposal.

113. By the 1970s, 3M had become concerned about the risks posed to the general population by exposure to 3M's fluorochemicals.

114. By no later than 1970, 3M knew that its PFAS-containing Products were hazardous to marine life. Still, 3M refused to take any steps to mitigate these hazards. In fact, around this time, 3M abandoned a study of its fluorochemicals after the company's release of the chemicals during the study caused severe pollution of nearby surface waters.

115. In 1975, 3M found there was a "universal presence" of PFOA and/or PFOS in blood serum samples taken from across the United States. Since PFAS are not naturally occurring, this finding reasonably alerted 3M to the high likelihood that its products were a source of this PFAS, a scenario 3M discussed internally but did not share outside the company. This finding also reasonably alerted 3M to the likelihood that PFAS are mobile, persistent, bioaccumulative, and biomagnifying, as these characteristics would explain the presence of PFAS in human blood.

116. As early as 1976, 3M began monitoring the blood of its employees for PFAS because the company was concerned about the health effects of PFAS.

117. In 1978, 3M conducted PFOS and PFOA studies in monkeys and rats. All monkeys died within the first few days or weeks after being given food contaminated with PFOS. The studies also showed that PFOS and PFOA affected the liver and gastrointestinal tract of the species tested.

118. In the late 1970s, 3M studied the fate and transport characteristics of PFOS in the environment, including in surface water and biota. A 1979 report drew a direct line between effluent from 3M's Decatur, Alabama plant and fluorochemicals bioaccumulating in fish tissue taken from the Tennessee River adjacent to the 3M plant.

119. According to a 3M environmental specialist who resigned his position due to the company's inaction over PFOS's environmental impacts, 3M had resisted calls from its own

ecotoxicologists going back to 1979 to perform an ecological risk assessment on PFOS and similar chemicals. At the time of the specialist's resignation in 1999, 3M continued its resistance.

120. In 1983, 3M scientists opined that concerns about PFAS "give rise to legitimate questions about the persistence, accumulation potential, and ecotoxicity of fluorochemicals in the environment."

121. In 1984, 3M's internal analyses proved that fluorochemicals were likely bioaccumulating in 3M's employees.

122. Despite its understanding of the hazards associated with the PFAS in its products, 3M suppressed scientific research on the hazards associated with them and mounted a campaign to control the scientific dialogue on the fate, exposure, analytics, and effects to human health and the ecological risks of PFAS.

123. At least one scientist funded by 3M saw his goal as "keep[ing] 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations," those articles "can be a large obstacle to refute."

124. Thus, 3M deceived others and hid the negative effects of PFAS. For example, Dr. Rich Purdy, a former environmental specialist with 3M, wrote a letter detailing, without limitation: (1) 3M's tactics to prevent research into the adverse effects of its PFOS, (2) 3M's submission of misinformation about its PFOS to EPA, (3) 3M's failure to disclose substantial risks associated with its PFOS to EPA, (4) 3M's failure to inform the public of the widespread dispersal of its PFOS in the environment and population, (5) 3M's production of chemicals it knew posed an ecological risk and a danger to the food chain, and (6) 3M's attempts to keep its workers from discussing the problems with the company's fluorochemical projects to prevent their discussions from being used in the legal process.

125. By the late 1990s, 3M's own toxicologist had calculated a "safe" level for PFOS in human blood to be 1.05 parts per billion ("ppb"), at a time when 3M was well aware that the average level of PFOS being found in the blood of the general population of the United States was approximately 30 times higher than this "safe" blood level, but 3M did not disclose that information to regulatory authorities or the public.

126. 3M knew, or should have known, that its PFAS-containing Products, including AFFF Products, in their intended use, would release PFAS that would dissolve in water; reach water systems and the environment in the State; resist degradation; bioaccumulate and biomagnify; and harm ecological, animal, and human health in the State due to their toxicity. Such knowledge was accessible to 3M, but not to the State until 3M's acts and omissions came to light and the State developed its own understanding of the toxicity of PFAS.

127. Despite knowing that PFAS are toxic and adversely affect the environment and human health, 3M advertised numerous PFAS-containing Products as consumer-friendly and safe for families.

128. For example, 3M began selling PFOS-based Scotchgard™ products in 1956, advertising them as protection for fabrics from water damage and stains. Scotchgard™ products exposed consumers to PFOS during application and, once the treated fabrics began to degrade, through air and dust. Yet, 3M continued to market Scotchgard™ products to consumers, to misrepresent them as safe for household use, and to fail to disclose health risks. From 1970 to 2002, carpet treatments like Scotchgard™ Fabric Protector were the most common use of PFOS substances, with 48,000 tons used worldwide.

129. As another example, in the 1970s, 3M applied Scotchban™ to consumer products like paper cups, cake mix boxes, and pet food packaging, as the grease-resistant chemicals left

paper intact. On information and belief, 3M did not warn paper mills or other manufacturers of these products about the toxicity of PFAS, leading to the propagation of misrepresentations to consumers.

130. 3M concealed information about its PFAS-containing Products' effects on human health and the environment. By concealing the "safe" blood level from the State, 3M delayed the implementation of safeguards that could have protected consumers from unknowingly purchasing PFAS-containing Products.

131. 3M knew that its PFAS-containing Products could be harmful, but it concealed and misrepresented that information to consumers. When 3M announced its phase-out of PFAS in 2000, it assured consumers that "our products are safe" instead of disclosing what it knew about the substantial threat posed by PFOS and PFOA.

132. 3M's deception and misrepresentations deprived consumers of the opportunity to make informed decisions about their health and their own contribution to environmental harm.

#### ii. Old DuPont Knew, or Should Have Known, of the Harms Caused by PFOA, and It Concealed Its Knowledge from Regulators and Users of PFAS-Containing Products, Including AFFF Products

133. In 1945, Old DuPont trademarked the fluoropolymer PTFE as Teflon®, introducing it to the consumer and industrial markets shortly thereafter. For decades, Old DuPont utilized PFOA as a processing aid in the production of PTFE, a practice which left residual PFOA in and on consumer products like Teflon® cookware. PFOA has been found in PTFE cookware, PTFE-based dental floss, PTFE-based dental tape, and PTFE film/sealant.

134. Old DuPont quickly developed an understanding of the dangers of using these chemicals. Its scientists issued internal warnings about the toxicity associated with PFOA as early

as 1961; Old DuPont's Toxicology Section Chief opined that such substances should be "handled with extreme care" and that contact with the skin should be "strictly avoided."

135. Still, Old DuPont advertised Teflon® as a protective coating for cookware and a soil and stain repellant for fabrics. Even after Old DuPont scientists warned the company about the toxicity of PFOA, advertisements from the 1970s continued to promote family and household use of Teflon®. For instance, Old DuPont released Stainmaster® Carpet in 1986, a stain-resistant carpet coated with Teflon®. Old DuPont advertised this product as especially helpful to families with children and pets, disregarding that the Stainmaster® Carpet increased children's exposure to harmful PFOA residue, as children are most likely to be on or near the ground.

136. Old DuPont also manufactured and advertised PTFE micropowders, under the Zonyl™ brand, beginning in the 1960s. Zonyl™ can break down in use or in the environment to PFOA and, according to Old DuPont, PFOA was an "unintended byproduct of the manufacturing process" of fluorotelomers like Zonyl™.

137. Zonyl™ was used in grease-resistant, nonstick paper and cardboard consumer products like fast food packaging and microwave popcorn bags. In a 1966 Food Additive Petition to the Food and Drug Administration ("FDA"), Old DuPont submitted data indicating that Zonyl™ could migrate into food in concentrations that caused rats fed Zonyl™ at the FDA's required "no-effect level" to suffer adverse liver reactions. After the FDA requested a longer-term health study, Old DuPont revised its calculations, suggested that a different compound was partially causing the toxic reaction, and got its Petition approved without submitting another study. In 1987, Old DuPont confirmed that levels of Zonyl™ in food could reach three times the approved amount.

138. In 1978, based on information it received from 3M about elevated and persistent organic fluorine levels in workers exposed to PFOA, Old DuPont initiated a plan to review and

monitor the health conditions of potentially exposed workers to assess whether any negative health effects were attributable to PFOA exposure. This monitoring plan involved obtaining blood samples from the workers and analyzing the samples for the presence of fluorine.

139. By 1979, Old DuPont had data indicating that, not only was organic fluorine/PFOA building up in the blood of its exposed workers (and was, thus, "biopersistent"), but those workers exposed to PFOA had a significantly higher incidence of health issues than did unexposed workers. Old DuPont did not share these data or the results of its worker health analysis with the general public or government entities, including the State, at that time.

140. The following year, Old DuPont internally confirmed, but did not make public, that PFOA "is toxic," that humans accumulate PFOA in their tissues, and that "continued exposure is not tolerable."

141. Not only did Old DuPont know that PFOA accumulated in humans, it was also aware that PFOA could cross the placenta from an exposed mother to her gestational child. In 1981, Old DuPont conducted a blood sampling study of pregnant or recently pregnant employees. Of the eight women in the study who worked with Teflon®, two had children with birth defects in their eyes or face and at least one had PFOA in the umbilical cord.

142. While Old DuPont reported to EPA in March 1982 that results from a rat study showed PFOA crossing the placenta if present in maternal blood, Old DuPont concealed the results of the blood sampling study it had conducted on its own workers. At this time, Old DuPont was also aware that PFAS could contaminate the surrounding environment, creating another pathway to human exposure. After obtaining data on PFAS releases from its facilities and the consequent contamination near Old DuPont's Washington Works plant in West Virginia, Old DuPont held a meeting at its corporate headquarters in Wilmington, Delaware, in 1984 to discuss health and

environmental issues related to PFOA in particular. Old DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability." They were resigned to Old DuPont's "incremental liability from this point on if we do nothing" because Old DuPont was "already liable for the past 32 years of operation." They also stated that the "legal and medical [departments within Old DuPont] will likely take the position of total elimination" of PFOA use in Old DuPont's business and that these departments had "no incentive to take any other position." Nevertheless, Old DuPont not only decided to keep using and releasing PFOA but affirmatively misrepresented to regulators, the scientific community, and the public that its PFOA releases presented no risks to human health or the environment.

143. Yet, a 2008 letter from Old DuPont's shareholders to the Securities and Exchange Commission explained that, while Old DuPont's management asserted that studies it had funded showed no harm to human health from PFOA exposure, Old DuPont's own Epidemiology Review Board adamantly disagreed with this conclusion and sent emails to the company lambasting the "no health effects" characterization. For example, in February 2006, the Board "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of [Old DuPont's] public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

144. In 2004, EPA filed an administrative enforcement action against Old DuPont based on its failure to disclose toxicity and exposure information for PFOA in violation of the TSCA and RCRA. Old DuPont eventually settled the lawsuit by agreeing to pay over $16 million in civil administrative penalties and supplemental environmental projects. EPA called the settlement the "largest civil administrative penalty EPA has ever obtained under any federal environmental statute."

145. Despite its knowledge regarding PFOA's toxicity, Old DuPont continued to claim that PFOA posed no health risks and, in fact, began to sell AFFF after 3M announced its phase-out of PFOA and PFOS in 2000 (due to 3M's knowledge of the compounds' toxicity and threats of further enforcement action by EPA).

146. In 2008, Old DuPont literature was quoted in an Industrial Fire World magazine article regarding AFFF, stating that Old DuPont "believes the weight of evidence indicates that PFOA exposure does not pose a health risk to the general public" because "there are no human health effects known to be caused by PFOA." Old DuPont also claimed that its other PFAS-containing products, whether they contained residual PFOA from the manufacturing process or degraded into PFOA in the environment or human body, were safe for personal, family, and household use. In February 2006, *The New York Times* noted that DuPont ran full page advertisements in its and others' newspapers telling the public that "cookware coated with Teflon 'is safe' and that 'there is no reason to stop' using it." Old DuPont knew these statements were not true but did not correct them.

147. Up until 2013, when Old DuPont claimed to have stopped making or using PFOA, it attempted to mislead regulators, scientists, and consumers into accepting and purchasing its substantially injurious PFAS-containing Products, including AFFF Products.

**iii. The Remaining Defendants Knew, or Should Have Known, of the Harm Caused by the Release of PFAS from Their PFAS-Containing Products, Including AFFF Products**

148. The remaining Defendants knew, or should have known, that, in their intended common use, their PFAS-containing Products, including AFFF Products, would harm the environment and human health.

149. The remaining Defendants knew, or should have known, that, due to their toxicity, their PFAS-containing Products, including AFFF Products, released PFAS that would dissolve in water; reach water systems and the environment in the State; resist degradation; bioaccumulate and biomagnify; and harm ecological, animal, and human health in the State.

150. Information regarding PFAS was readily accessible to each of the remaining Defendants for decades. Each is an expert in the field of PFAS-containing Products, including AFFF Products, and related PFAS precursors, and each has detailed information and understanding about the PFAS in AFFF Products. The State, by contrast, did not have access to such information.

**iv. Old DuPont Worked in Concert with Other Defendants and the Firefighting Foam Coalition to Protect AFFF Products from Scrutiny**

151. The Firefighting Foam Coalition ("FFFC"), a Virginia-based national AFFF trade group, was formed in 2001 to advocate for AFFF's continued viability. Over time, Tyco/Ansul, Chemguard, Dynax, Old DuPont, and Chemours (collectively, "FFFC Members") became FFFC members, as were others in the industry. FFFC Members used PFOA in their AFFF Products, rather than PFOS, and claimed that PFOA was a far safer option. Through their involvement in the FFFC and other trade associations and groups, FFFC Members shared knowledge and information regarding PFOA and its precursors but did not share that information with the general public or government entities, including the State.

152. FFFC Members worked together to protect their AFFF Products from scrutiny by, among other things, coordinating their messaging on PFOA's toxicological profile and on their AFFF Products' contribution of PFOA into the environment. All of this was done as a part of the FFFC's efforts to shield its members and the AFFF industry from the detrimental impact of the public and government entities learning the truth about the harms of PFOA to the environment and

human health. FFFC Members regularly published newsletters promoting their AFFF Products and attended trade group conferences to disseminate misleading messaging.

153. FFFC Members' coordinated messaging and publishing efforts were meant to dispel concerns about the impact AFFF Products had on the environment and human health. They worked in concert to conceal the known risks of their AFFF Products from the general public and government entities, including the State.

154. FFFC Members knew that their messaging regarding AFFF Products was false. Each of the FFFC Members knew that PFOA was released directly into the environment from the use of their AFFF Products and that PFOA presented a similar threat to the environment and public health as that posed by PFOS. While FFFC Members knew this, it was not similarly understood by the public and government entities, including the State, because FFFC Members withheld their knowledge about the dangers of PFAS and AFFF Products.

## E. PFAS-Containing Products, Including AFFF Products, Have Resulted in PFAS Contamination in the State, Including Sources of Drinking Water, and Defendants Are Liable for Costs to Remediate and Restore Contaminated Natural Resources

155. The State's natural resources have been contaminated with PFAS by the use of PFAS-containing Products, and investigation of that contamination is ongoing. For example, Defendants' designing, manufacturing, marketing, promoting, distributing, and selling of AFFF Products in the State, including to the U.S. military, have been substantial factors in causing PFAS contamination and its injuries to the natural resources of the State. As investigation continues, it is expected that significant further PFAS contamination will be discovered.

156. The contamination from Defendants' AFFF Products is widespread in the State. The following sites exemplify the significant contamination these products have caused in the

State: Joint Base Pearl Harbor-Hickam, Daniel K. Inouye International Airport, Kahului Airport, and Ellison Onizuka Kona International Airport.

157. On the island of O‘ahu, Joint Base Pearl Harbor-Hickam, located at 850 Ticonderoga Street, Pearl Harbor, is contaminated with PFAS derived from the United States Navy’s use of AFFF in firefighting training areas, fire suppression systems, and emergency response actions. A Site Inspection conducted in 2022 by the Department of the Navy Environmental Restoration Program revealed the presence of PFAS far in excess of EPA’s lifetime Health Advisory values in 28 samples tested for PFOA, PFOS, and PFHxS; Health Advisory values are concentrations of drinking water contaminants at or below which adverse health impacts are not anticipated to occur. In comparison to the 2022 lifetime Health Advisory values of 0.004 ppt for PFOA and 0.02 ppt for PFOS, levels were reported at 98,500 ppt and 2,620,000 ppt, respectively.

158. Moreover, on November 29, 2022, approximately 1,300 gallons of AFFF spilled from Joint Base Pearl Harbor-Hickam’s Red Hill Bulk Fuel Storage Facility and contaminated the surrounding environment. Even before the AFFF spill, PFAS had been detected in Red Hill’s groundwater at levels above EPA’s interim health advisory levels.

159. Daniel K. Inouye International Airport, located at 300 Rodgers Boulevard, Honolulu, is contaminated with PFAS resulting from the storage, release, and overspray of AFFF. A 2021 Site Inspection reported levels of PFOS in groundwater as high as 1,900,000 ppt, PFOA at 110,000 ppt, and PFHxS at 879,000 ppt. A corresponding Environmental Hazard Evaluation found PFAS in near-surface and subsurface soil at levels high enough to pose a direct exposure hazard. PFAS in groundwater were detected at levels high enough to pose an aquatic ecotoxicity hazard to flora and fauna in the adjacent surface waters of Ke‘ehi Lagoon and the Pacific Ocean.

160. On the island of Maui, Kahului Airport, located at 1 Kahului Airport Road, Kahului, is contaminated with PFAS derived from AFFF. Samples from 2021 contained PFOS at levels as high as 2,500,000 ppt, PFOA at 82,000 ppt, and PFHxS at 250,000 ppt. A 2021 Environmental Hazard Evaluation conducted at an Aircraft Rescue and Firefighting training facility found PFAS in soil at levels high enough to pose direct exposure and leaching hazards. PFAS in groundwater were detected at levels high enough to pose an aquatic ecotoxicity hazard to flora and fauna in Kahului Bay. The training facility sits approximately 0.16 miles south of Kahului Bay and just east of Kanahā Pond Wildlife Sanctuary.

161. Evaluators determined that the high levels of PFAS in the groundwater at the training facility are most likely a result of AFFF overspray flowing onto unpaved ground and infiltrating through the cracks in the pavement.

162. On the island of Hawaiʻi, Ellison Onizuka Kona International Airport, located at 73-200 Kupipi Street, Kailua-Kona, is contaminated with PFAS from AFFF. A May 2023 Environmental Hazard Evaluation at an Aircraft Rescue and Firefighting training facility determined that PFAS in soil could pose a direct exposure hazard during ground disturbing activities and reuse of contaminated gravel, with levels of PFOS detected at 46,900 ppt and PFHxS at 96,700 ppt. Five additional PFAS compounds (PFOA, PFBS, PFBA, PFPeA, and PFPeS) were found at levels in the thousand ppt range. In addition, the surface water in the holding pond is an active nesting ground for the Hawaiian Stilt. Thus, PFAS in surface water could pose a surface water ecotoxicity hazard to the Hawaiian Stilt. Kona Airport is located approximately one mile east of the Pacific Ocean, into which its contaminated groundwater eventually drains.

163. All PFAS-containing Products, not just AFFF, have injured the State's natural resources. PFAS enter the environment through releases of leachate from unlined municipal

landfills, discharge from cesspools, urban runoff, and the use of PFAS-containing effluent and biosolids from wastewater treatment facilities for agriculture and irrigation, among other sources. Leachate generated at landfills that hold discarded PFAS-containing Products, such as household items coated with stain and waterproofing materials, has been shown to have high concentrations of PFAS. The State is currently sampling wastewater and biosolids from wastewater treatment plants and landfill leachate across Hawaiʻi to determine the precise concentrations of PFAS.

164. PFAS detections in drinking water have been reported to the State at the following locations: Halawa Wells Pumping Station (Honolulu Board of Water Supply ("BWS")); Aiea Halawa Shaft (Navy Joint Base Pearl Harbor Hickam); Aina Koa Well I (Honolulu BWS); Kipapa Acres (Kipapa Acres C.P.R.); Waipahu Wells II (Honolulu BWS); Del Monte Kunia 3 Well (Kunia Village); Makakilo Well (Honolulu BWS); Waipiʻo Heights Wells (Honolulu BWS); Moanalua Wells (Honolulu BWS); Kunia Well #4 (Kunia Village); and Kaʻamilo Wells Pumping Station (Honolulu BWS).

165. PFAS contamination is being investigated at and around multiple military sites in the State. For example, a 2020 Preliminary Assessment identified a confirmed release of AFFF at the Kalaeloa Army Aviation Support site (Hawaiʻi Army National Guard), and a 2023 Site Inspection confirmed PFAS exceeding applicable screening levels at the Waiawa Gulch Training Site and Unit Training and Equipment Site (Hawaiʻi Army National Guard). Preliminary Assessments and Site Inspections have revealed PFAS at the following U.S. Army sites, where further remedial investigation is planned: Aliamanu Military Reservation; Fort Shafter and Fort DeRussy Military Reservation; Pohakuloa Training Area and Kilauea Military Reservation; Schofield Barracks and Kawailoa-Poamoho Training Area; Tripler Army Medical Center; and

Wheeler Army Airfield. In addition to Joint Base Pearl Harbor-Hickam, PFAS have been detected at the following Navy sites: Former Naval Air Station Barbers Point; and Kaneohe Bay MCB.

166. As investigation of PFAS contamination continues, additional impacted areas will be discovered on a location-by-location basis. Such investigation is necessary to ascertain the scope of contamination related to PFAS-containing Products and to return the affected natural resources to levels that are safe for human health and the environment.

167. Defendants are liable for the cost of investigation, remediation, and restoration of all the State's property, soils, sediments, waters, and other natural resources contaminated with PFAS from PFAS-containing Products, as well as for the State's loss of past, present, and future use of such contaminated natural resources.

168. The PFAS contamination in groundwater and surface water is impacting the State's drinking water sources. Defendants are liable for all of the costs necessary to investigate and treat (in perpetuity) any and all drinking water wells and sources of drinking water in the State that are adversely affected by PFAS from Defendants' PFAS-containing Products, including AFFF Products.

**F. Old DuPont's Multi-Step, Years'-Long Fraudulent Scheme to Isolate Its Valuable Tangible Assets from Its PFAS Liabilities**

169. Beginning in or about 2013 and continuing through at least June 2019, Old DuPont planned and executed a series of corporate restructurings designed to separate its valuable assets from its billions of dollars of legacy environmental liabilities—especially those arising from PFOA and other PFAS contamination.

170. Old DuPont's potential cumulative liability related to PFOA and other PFAS, including AFFF that contained PFAS, is likely billions of dollars due to the persistence, mobility,

bioaccumulative properties, and toxicity of these "forever" compounds, as well as Old DuPont's decades'-long attempt to hide the dangers of PFAS from the public.

171. For more than five decades, Old DuPont manufactured, produced, or utilized PFOA and other PFAS at plants in New Jersey, West Virginia, and North Carolina, among others. As alleged above, throughout this time, Old DuPont was aware that PFOA is toxic, harmful to animals and humans, bioaccumulative, and persistent in the environment. Old DuPont also knew that it had emitted and discharged PFOA and other PFAS in large quantities into the environment and that many people had been exposed to PFOA, including through public and private drinking water supplies, like those in the State, which Old DuPont had contaminated. Thus, Old DuPont knew, or reasonably should have known, that it faced billions of dollars in liabilities arising from its use of PFAS, including AFFF that contained PFAS.

172. Beginning in at least 1999 and continuing to the present, Old DuPont has faced mounting litigation arising from its historic manufacture, production, and use of PFAS. In 1999, members of the Tennant family, who owned property affected by contamination from a landfill that had accepted PFOA wastes from Old DuPont's nearby Washington Works plant, sued Old DuPont in West Virginia federal court.

173. Old DuPont's in-house counsel were very concerned about Old DuPont's exposure to liability related to PFOA. In November 2000, one of Old DuPont's in-house lawyers handling PFOA issues wrote to his co-counsel: "We are going to spend millions to defend these lawsuits and have the additional threat of punitive damages hanging over our head. Getting out in front and acting responsibly can undercut and reduce the potential for punitives. . . . Our story is not a good one, we continued to increase our emissions into the river in spite of internal commitments to

reduce or eliminate the release of this chemical into the community and the environment because of our concern about the biopersistence of this chemical."

174. In 2005, after settling the Tennant case, Old DuPont settled the claims brought by EPA for violations of TSCA and RCRA related to its failure to disclose toxicity and exposure information for PFOA, as discussed in ¶ 144.

175. Also in 2005, a West Virginia court entered a final order approving a 2004 settlement of a class action lawsuit filed against Old DuPont on behalf of 70,000 Ohio and West Virginia residents who had been exposed to PFOA that Old DuPont had discharged from Washington Works.

176. Under the terms of the settlement, which provided class benefits in excess of $300 million, Old DuPont agreed to fund a panel of scientists (the "Science Panel") to confirm which diseases were linked to PFOA exposure, to filter local water from impacted public and private drinking water supplies, and to pay up to $235 million for medical monitoring of the affected community for any diseases that the Science Panel linked to PFOA exposure. The settlement also provided that any class members who developed the diseases linked by the Science Panel would be entitled to sue for personal injury, and Old DuPont agreed not to contest the fact that the class members' exposure to PFOA could have caused each of the linked diseases.

177. By 2012, after seven years of studies, the Science Panel confirmed "probable links" between exposure to PFOA and the following serious human diseases: medically diagnosed high cholesterol, ulcerative colitis, pregnancy induced hypertension, thyroid disease, testicular cancer, and kidney cancer.

178. After the Science Panel confirmed such probable links with human disease, more than 3,500 personal injury claims were filed against Old DuPont in Ohio and West Virginia by

class members with one or more of those linked diseases under the terms of the 2005 class settlement. In 2013, these claims were consolidated in federal multidistrict litigation styled *In Re: E. I. du Pont de Nemours and Company C-8 Personal Injury Litigation* (MDL No. 2433) in the U.S. District Court for the Southern District of Ohio. Forty bellwether trials were scheduled to take place in 2015 and 2016.

179. Old DuPont knew or should have known that it faced substantial exposure at these trials, as well as the liability related to PFOA and other PFAS contamination caused by its manufacturing operations at other sites throughout the country, and that its liability likely measured in the billions of dollars.

180. Anticipating this significant liability exposure, Old DuPont convened an internal initiative known as "Project Beta" in or about 2013 for Old DuPont's management to consider restructuring the company in order to, among other things, avoid responsibility for the widespread environmental harm that Old DuPont's PFAS had caused and shield billions of dollars in assets from these substantial liabilities.

181. In furtherance of possible restructuring opportunities, including potential mergers, Old DuPont and The Dow Chemical Company ("Old Dow") began to discuss a possible "merger of equals" in or about 2013.

182. However, neither Old Dow, nor any other rational merger partner, would agree to a transaction that would result in exposing it to the substantial PFAS and environmental liabilities that Old DuPont faced.

183. Accordingly, Old DuPont's management decided to pursue a multiyear corporate restructuring specifically orchestrated to isolate Old DuPont's massive legacy liabilities from its

valuable tangible assets in an attempt to shield those assets from creditors and entice Old Dow to pursue the proposed merger.

184. Old DuPont engaged in a coordinated three-part restructuring plan that consisted of (i) Old DuPont's attempt to cast off its massive environmental liabilities onto Chemours and spinning off Chemours as a separate publicly traded company; (ii) the creation of New DuPont to facilitate a purported merger with Old Dow; and (iii) a series of internal restructurings and divestitures that culminated with the spinoff of Old DuPont to its newly formed parent, Corteva.

185. The first step in Old DuPont's fraudulent scheme was to transfer its performance chemicals business, which included Teflon and other products ("Performance Chemicals Business") into its wholly owned subsidiary, Chemours. Then, in July 2015, Old DuPont "spun off" Chemours as a separate public entity and saddled Chemours with Old DuPont's massive legacy liabilities (the "Chemours Spinoff").

186. Old DuPont knew that Chemours was undercapitalized and could not satisfy the massive liabilities that it caused Chemours to assume. Old DuPont also knew that the Chemours Spinoff alone would not insulate its own assets from its PFAS liabilities as Old DuPont still faced direct liability for its own conduct.

187. The second step involved Old DuPont and Old Dow entering into an "Agreement and Plan of Merger" in December 2015, pursuant to which Old DuPont and Old Dow merged with subsidiaries of a newly formed holding company, DowDuPont, Inc. ("DowDuPont"), which was created for the sole purpose of effectuating the merger. Old DuPont and Old Dow became subsidiaries of DowDuPont.

188. In the third step, DowDuPont engaged in numerous business segment and product line "realignments" and "divestitures."

189. Those realignments and divestitures culminated in DowDuPont spinning off two new publicly traded companies: (i) Corteva, which currently holds Old DuPont as a subsidiary, and (ii) Dow, Inc. ("New Dow"), which currently holds Old Dow. DowDuPont was then renamed DuPont de Nemours, Inc. (i.e., New DuPont).

190. Old DuPont's restructuring—beginning with the spinoff of Chemours in 2015 and ending with the spinoff of Corteva in 2019—was designed to separate Old DuPont's massive historic PFAS liabilities from its valuable, non-PFAS assets and thereby hinder, delay, and defraud creditors.

191. As a result of this restructuring, between December 2014 (i.e., before the Chemours Spinoff) and December 2019 (i.e., after the Dow merger), the value of Old DuPont's tangible assets decreased by $20.85 billion, or by approximately one-half.

192. New DuPont and Corteva now hold a significant portion of the tangible assets that Old DuPont formerly owned.

193. Many of the details about these transactions are hidden from the public in confidential schedules and exhibits to the various restructuring agreements. Old DuPont, New DuPont, and Corteva have, likely intentionally, buried these details in an apparent attempt to hide from creditors, like the State, where Old DuPont's valuable assets went and the inadequate consideration that Old DuPont received in return.

194. The below graphic depicts the restructuring as it progressed through each of the three steps:




195. In greater detail, the restructuring scheme was implemented as follows.

**i. Step 1: The Chemours Spinoff**

196. In February 2014, Old DuPont formed Chemours as a wholly owned subsidiary.

197. On April 30, 2015, Chemours was converted from a limited liability company to a corporation named "The Chemours Company."

198. On July 1, 2015, Old DuPont completed the spinoff of Chemours, and Chemours became a separate, publicly traded entity.

199. At the time of the spinoff, the Performance Chemicals Business consisted of Old DuPont's Titanium Technologies, Chemical Solutions, and Fluoroproducts segments, including business units that had manufactured, used, and discharged PFOA into the environment.

200. Prior to the Chemours Spinoff, Chemours's Board of Directors was dominated by Old DuPont employees. As a result, during the period of time that the terms of its separation from

Old DuPont were being negotiated, Chemours did not have an independent Board of Directors or management independent of Old DuPont.

201. To effectuate the Chemours Spinoff, Old DuPont and Chemours entered into a June 26, 2015 Separation Agreement (the "Chemours Separation Agreement").

202. Pursuant to the Chemours Separation Agreement, Old DuPont agreed to transfer to Chemours all businesses and assets related to the Performance Chemicals Business, including 37 active chemical plants.

203. At the same time, Chemours accepted a broad assumption of Old DuPont's massive liabilities relating to Old DuPont's Performance Chemicals Business. The specific details regarding the nature and value of probable maximum loss and the anticipated timing of the liabilities that Chemours assumed are set forth in the nonpublic schedules and exhibits to the Chemours Separation Agreement.

204. Notwithstanding the billions of dollars in environmental and PFAS liabilities that Chemours would face, on July 1, 2015, Old DuPont caused Chemours to transfer to Old DuPont approximately $3.4 billion as a cash dividend, along with a "distribution in kind" of promissory notes with an aggregate principal amount of $507 million.

205. Thus, in total, Chemours distributed approximately $3.9 billion to Old DuPont. On May 12, 2015, Old DuPont required Chemours to fund these distributions through financing transactions, including senior secured term loans and senior unsecured notes totaling approximately $3.995 billion. Also, Chemours distributed approximately $3 billion in common stock to Old DuPont's shareholders on July 1, 2015 (181 million shares at $16.51 per share price).

206. Accordingly, most of the valuable assets that Chemours may have had at the time of the Chemours Spinoff were unavailable to creditors with current or future PFAS claims, like

those of the State, and Old DuPont stripped Chemours's value for itself and its shareholders. Old DuPont, however, transferred only $4.1 billion in net assets to Chemours.

207. In addition to requiring Chemours to assume billions of dollars of Old DuPont's PFAS liabilities, the Chemours Separation Agreement includes an indemnification of Old DuPont in connection with those liabilities, which is uncapped and does not have a survival period.

208. Specifically, the Chemours Separation Agreement requires Chemours to indemnify Old DuPont against, and assume for itself, all "Chemours Liabilities," which are defined broadly to include, among other things, "any and all Liabilities relating . . . primarily to, arising primarily out of or resulting primarily from, the operation or conduct of the Chemours Business, as conducted at any time prior to, at or after the Effective Date . . . including . . . any and all Chemours Assumed Environmental Liabilities," which includes Old DuPont's historic liabilities relating to and arising from its decades of emitting pollution, including PFOA, into the environment from its dozens of facilities.

209. Under the Chemours Separation Agreement, Chemours must indemnify Old DuPont against and assume for itself the Chemours Liabilities regardless of (i) when or where such liabilities arose; (ii) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the Chemours Spinoff; (iii) where or against whom such liabilities are asserted or determined; (iv) whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of law, fraud, or misrepresentation by any member of the Old DuPont group or the Chemours group; (v) the accuracy of the maximum probable loss values assigned to such liabilities; and (vi) which entity is named in any action associated with any liability.

210. The Chemours Separation Agreement also requires Chemours to indemnify Old DuPont from, and assume all, environmental liabilities that arose prior to the Chemours Spinoff if they were "primarily associated" with the Performance Chemicals Business.

211. In addition, Chemours agreed to use its best efforts to be fully substituted for Old DuPont with respect to "any order, decree, judgment, agreement or Action with respect to Chemours Assumed Environmental Liabilities."

212. In May 2019, Chemours sued Old DuPont, New DuPont, and Corteva in Delaware Chancery Court. *See The Chemours Company v. DowDuPont, et al.*, C.A. No. 2019-0351 (Del. Ch. Ct., filed May 13, 2019).

213. In its Amended Complaint—which was verified by Chemours's current Chief Executive Officer, Mark Newman—Chemours alleged that the primary motivation for the Chemours Spinoff, the subsequent creation of New DuPont, and the final separation of Corteva was to enable Old DuPont to "wash its hands of its environmental liabilities."

214. Chemours also alleged, among other things, that if (i) the full value of Old DuPont's PFAS and environmental liabilities were properly estimated and (ii) the Delaware court did not limit the liability that the Chemours Separation Agreement imposed on it, then Chemours would have been insolvent at the time it was spun off from Old DuPont.

215. There was no meaningful, arms'-length negotiation of the Chemours Separation Agreement, and Old DuPont largely dictated its terms.

216. In its Delaware lawsuit, Chemours alleged that Old DuPont refused to allow any procedural protections for Chemours in the negotiations, and Old DuPont and its outside counsel prepared all of the documents to effectuate the Chemours Spinoff. Indeed, during the period in which the terms of the commercial agreements between Chemours and Old DuPont were

negotiated, Chemours did not have an independent board of directors or management independent of Old DuPont.

217. Old DuPont's apparent goal with respect to the Chemours Spinoff was to segregate a large portion of Old DuPont's legacy environmental liabilities, including liabilities related to its PFAS chemicals and products such as AFFF that contained PFAS and, in so doing, shield Old DuPont.

218. Not surprisingly, given Old DuPont's extraction of nearly $4 billion from Chemours immediately prior to the Chemours Spinoff, Chemours was thinly capitalized and unable to satisfy the substantial liabilities that it assumed from Old DuPont. Indeed, Chemours disclosed in public filings with the U.S. Securities and Exchange Commission ("SEC") that its "significant indebtedness" arising from its separation from Old DuPont restricted its current and future operations.

219. Shortly after the Chemours Spinoff, market analysts described Chemours as "a bankruptcy waiting to happen" and a company "purposely designed for bankruptcy."

220. At the end of December 2014, Chemours reported it had total assets of $5.959 billion and total liabilities of $2.286 billion. At the end of 2015, following the Chemours Spinoff, Chemours reported that it had total assets of $6.298 billion and total liabilities of $6.168 billion, yielding a total net worth of $130 million.

221. For the year 2015, Chemours reported $454 million in "other accrued liabilities," which in turn included $11 million for accrued litigation and $68 million for environmental remediation. Chemours separately reported $553 million in "other liabilities," which included an additional $223 million for environmental remediation and $58 million for accrued litigation.

222. Chemours significantly underestimated its liabilities, including the liabilities that it had assumed from Old DuPont with respect to PFAS, which Old DuPont and Chemours knew or should have known would be billions of dollars in addition to other environmental liabilities for other contaminants discharged at Old DuPont's and Chemours's facilities.

223. For example, in 2017, Chemours and Old DuPont amended the Chemours Separation Agreement in connection with the settlement of the Ohio MDL brought by thousands of residents who had been exposed to PFOA from Old DuPont's Washington Works plant. Per the amendment, Chemours paid $320.35 million to the plaintiffs in the settlement on August 21, 2017, and Old DuPont paid an additional $320.35 million on September 1, 2017.

224. Had the full extent of Old DuPont's legacy liabilities been taken into account, as they should have been at the time of the Chemours Spinoff, Chemours would have had negative equity (that is, total liabilities greater than total assets), not only on a tangible basis, but also on a total equity basis, and Chemours would have been rendered insolvent at that time.

**ii. Step 2: The Old Dow/Old DuPont "Merger"**

225. After the Chemours Spinoff, Old DuPont took the untenable position that it was somehow no longer responsible for the widespread PFAS contamination that it had caused over several decades.

226. Of course, Old DuPont could not contractually discharge all of its historical liabilities through the Chemours Spinoff, and Old DuPont remained liable for the liabilities it had caused and Chemours had assumed.

227. Old DuPont knew that it could not escape liability and would still face exposure for PFAS liabilities, including for potentially massive punitive damages. So Old DuPont moved to the next phase of its fraudulent scheme.

228. On December 11, 2015, less than six months after the Chemours Spinoff, Old DuPont and Old Dow announced that their respective boards had approved an agreement "under which the companies [would] combine in an all-stock merger of equals" and that the combined company would be named DowDuPont, Inc. (the "DowDuPont Merger"). The companies disclosed that they intended to subsequently separate the combined companies' businesses into three publicly traded companies through further spinoffs, each of which would occur 18 to 24 months following the closing of the merger.

229. To effectuate the transaction, Old DuPont and Old Dow entered into an Agreement and Plan of Merger (the "DowDuPont Merger Agreement") that provided for (i) the formation of a new holding company Diamond-Orion HoldCo, Inc., later named DowDuPont and then renamed DuPont de Nemours, Inc. (i.e., New DuPont), and (ii) the creation of two new merger subsidiaries into which Old Dow and Old DuPont each would merge.

230. Thus, as a result of the merger, and in accordance with the DowDuPont Merger Agreement, Old Dow and Old DuPont each became wholly owned subsidiaries of DowDuPont.

231. Although Old DuPont and Old Dow referred to the transaction as a "merger of equals," the two companies did not actually merge at all, likely because doing so would have infected Old Dow with all of Old DuPont's historical PFAS liabilities. Rather, Old DuPont and Old Dow became affiliated sister companies that were each owned by the newly formed DowDuPont. DowDuPont was aware of Old DuPont's historical PFAS liabilities.

232. The corporate organization following the "merger" is depicted under "Step 2" in the graphic in ¶ 194.

### iii. Step 3: The Shuffling, Reorganization, and Transfer of Valuable Assets Away from Old DuPont and Separation of Corteva and New Dow

233. Following the DowDuPont Merger, DowDuPont underwent a significant internal reorganization and engaged in numerous business segment and product line "realignments" and "divestitures." The net effect of these transactions has been the transfer, either directly or indirectly, of a substantial portion of Old DuPont's assets out of the company.

234. It is apparent that the transactions were intended to further frustrate and hinder creditors with claims against Old DuPont, including with respect to its substantial environmental and PFAS liabilities.

235. Old DuPont's assets, including its remaining business segments and product lines, were transferred either directly or indirectly to DowDuPont, which reshuffled the assets and combined them with the assets of Old Dow, and then reorganized the combined assets into three distinct divisions: (i) the "Agriculture Business," (ii) the "Specialty Products Business," and (iii) the "Materials Science Business."

236. While the precise composition of these divisions, including many details of the specific transactions, the transfer of business segments, and the divestiture of product lines during this time, are not publicly available, it is apparent that Old DuPont transferred a substantial portion of its valuable assets to DowDuPont for far less than the assets were worth.

237. Once the assets of Old DuPont and Old Dow were combined and reorganized, DowDuPont incorporated two new companies to hold two of the three newly formed business lines: (i) Corteva, which became the parent holding company of Old DuPont, which in turn holds the Agriculture Business, and (ii) New Dow, which became the parent holding company of Old Dow and holds the Materials Science Business. DowDuPont retained the Specialty Products Business and prepared to spin off Corteva and New Dow into separate, publicly traded companies.

238. The below graphic depicts the structure of DowDuPont after the internal reorganization and realignment (and notes the planned disposition of the new companies):




239. The mechanics of the separations are governed by the April 1, 2019 Separation and Distribution Agreement among Corteva, New Dow, and DowDuPont (the "DowDuPont Separation Agreement").

240. The DowDuPont Separation Agreement generally allocates the assets primarily related to the respective business divisions to Corteva (Agriculture Business), New Dow (Materials Science Business), and New DuPont (Specialty Products Business). New DuPont also retained several "non-core" business segments and product lines that once belonged to Old DuPont.

241. Similarly, Corteva, New Dow, and New DuPont each retained the liabilities primarily related to the business divisions that they retained—(i) Corteva retained and assumed the liabilities related to the Agriculture Business, (ii) New DuPont retained and assumed the

liabilities related to the Specialty Products Business, and (iii) New Dow retained and assumed the liabilities related to the Materials Science Business.

242. Corteva and New DuPont also assumed direct financial liability of Old DuPont that was not related to the Agriculture, Materials Science, or Specialty Products Businesses, including the PFAS liabilities. These assumed PFAS liabilities are allocated between Corteva and New DuPont pursuant to the DowDuPont Separation Agreement.

243. This "allocation" applies to Old DuPont's legacy liabilities for PFAS contamination and its former Performance Chemicals Business, including the State's claims in this case.

244. While New DuPont and Corteva have buried the details in nonpublic schedules, New DuPont and Corteva each assumed these liabilities under the DowDuPont Separation Agreement, along with other liabilities related to Old DuPont's discontinued and divested businesses. The State can therefore bring claims against New DuPont and Corteva directly for Old DuPont's contamination of and damage to the State's natural resources.

245. The separation of New Dow was completed on or about April 1, 2019, when DowDuPont distributed all of New Dow's common stock to DowDuPont stockholders as a pro rata dividend.

246. DowDuPont then consolidated the Agricultural Business line into Old DuPont and "contributed" Old DuPont to Corteva.

247. On June 1, 2019, DowDuPont spun off Corteva as an independent public company, when DowDuPont distributed all of Corteva's common stock to DowDuPont stockholders as a pro rata dividend.

248. Corteva now holds 100% of the outstanding common stock of Old DuPont.

249. The corporate structures of New DuPont, New Dow and Old Dow, and Corteva and Old DuPont, respectively, following the separations are depicted in Step 3 of the graphic in ¶ 194.

250. Also, on or about June 1, 2019, DowDuPont changed its registered name to DuPont de Nemours, Inc. (i.e., New DuPont).

251. On or about January 1, 2023, Old DuPont changed its registered name to EIDP, Inc.

## G. The Effect of the Years'-Long Conspiracy to Defraud the State and Other Creditors and Avoid Financial Responsibility for Legacy Liabilities

252. The net result of these transactions, including the June 1, 2019 Corteva spinoff, was to strip away valuable tangible assets from Old DuPont and transfer those assets to New DuPont and Corteva for far less than the assets are worth.

253. Old DuPont estimated that the DowDuPont Merger created "goodwill" worth billions of dollars. When the Corteva separation was complete, a portion of this "goodwill" was assigned to Old DuPont in order to prop up its balance sheet. But, in reality, Old DuPont was left with substantially fewer tangible assets than it had prior to the restructuring.

254. In addition, Old DuPont owes a debt to Corteva of approximately $4 billion. SEC filings demonstrate the substantial deterioration of Old DuPont's finances and the drastic change in its financial condition before and after the above transactions.

255. For example, for the 2014 fiscal year, prior to the Chemours Spinoff, Old DuPont reported $3.6 billion in net income and $3.7 billion in cash provided by operating activities. For the 2019 fiscal year, just months after the Corteva separation, however, Old DuPont reported a net loss of $1 billion and only $996 million in cash provided by operating activities. That is a decrease of 128% in net income and a decrease of 73% in annual operating cash flow.

256. Additionally, Old DuPont reported a significant decrease in Income from Continuing Operations Before Income Taxes (a/k/a Earnings Before Tax, or "EBT"). Old DuPont

reported $4.9 billion in EBT for the period ending December 31, 2014. For the period ending December 31, 2019, Old DuPont reported EBT of negative $422 million.

257. Also, for the 2014 fiscal year, prior to the Chemours Spinoff, Old DuPont owned nearly $41 billion in tangible assets. For the 2019 fiscal year, Old DuPont owned just under $21 billion in tangible assets.

258. That means in the five-year period over which the restructuring occurred, when Old DuPont knew that it faced billions of dollars in environmental and PFAS liabilities, Old DuPont transferred or divested approximately half of its tangible assets—totaling $20 billion.

259. As of September 2019, just after the Corteva spinoff, Old DuPont reported $43.251 billion in assets. But almost $21.835 billion of these assets were composed of intangible assets, including "goodwill" from its successive restructuring activities.

260. At the same time, Old DuPont reported liabilities totaling $22.060 billion. Thus, when the Corteva spinoff was complete, Old DuPont's tangible net worth (excluding its intangible assets) was negative $644 million.

261. In addition, neither New DuPont nor Corteva has publicly conceded that they assumed Old DuPont's historical environmental and PFAS liabilities. And it is far from clear that either entity will be able to satisfy future judgments.

262. Indeed, New DuPont—to which PFAS liabilities are allocated under the DowDuPont Separation Agreement—has divested numerous business segments and product lines, including tangible assets that it received from Old DuPont and for which Old DuPont has received less than reasonably equivalent value and is in the process of divesting more.

263. Old DuPont's parent holding company, Corteva—to which PFAS liabilities are also allocated under the DowDuPont Separation Agreement once certain conditions are satisfied—

holds as its primary tangible asset the intercompany debt owed to it by its wholly owned subsidiary, Old DuPont. But Old DuPont does not have sufficient tangible assets to satisfy this debt obligation.

264. The Chemours Spinoff, the DowDuPont Merger and the final separation of Corteva were part of a single coordinated fraudulent scheme to hinder, delay, and defraud Old DuPont's creditors.

## VI. CLAIMS

### COUNT I.
### PUBLIC NUISANCE
### (AGAINST ALL DEFENDANTS)

265. The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

266. Defendants created a public nuisance by manufacturing, marketing, and distributing their PFAS-containing Products, including AFFF Products, in a manner that resulted in the contamination of the State's natural resources with PFAS.

267. PFAS contamination of the State's drinking water supplies and other natural resources endangers the health and safety of Hawai'i's residents.

268. Defendants have substantially and unreasonably interfered with the use and enjoyment of the natural resources within the State, which are held in trust for the common benefit of the public, by releasing and/or causing the release of PFAS and allowing PFAS to contaminate, bioaccumulate, biomagnify, and persist in the environment.

269. The harm to the State, its natural resources, and its residents is extremely grave and outweighs the utility of Defendants' conduct.

270. Defendants knew or had reason to know that PFAS are persistent, bioaccumulative, and toxic.

271. Defendants knew or had reason to know that PFAS are released into the environment as a result of the use of their PFAS-containing Products, including AFFF Products, and that this PFAS would migrate to and contaminate natural resources.

272. Defendants knew or had reason to know that their manufacture, sale, and distribution of their PFAS-containing Products, including AFFF Products, would result in long-lasting contamination of the State's natural resources, including drinking water sources.

273. The State has been damaged and continues to suffer damages as a result of Defendants' conduct. The State has incurred and continues to incur costs to identify PFAS contamination from PFAS-containing Products, including AFFF Products, to prevent PFAS from contaminating additional natural resources, and to remediate the State's natural resources that have been contaminated with PFAS from PFAS-containing Products, including AFFF Products.

274. The injury to Hawai'i's natural resources is especially injurious to the State in its proprietary and natural resource trustee capacities.

275. The State is incurring and will incur costs to investigate, monitor, and remediate, and restore PFAS contamination from PFAS-containing Products, including AFFF Products, in its natural resources.

276. Defendants are liable and subject to injunctive relief prohibiting the creation and continuance of this public nuisance, and the State is entitled to all direct and consequential damages from that nuisance. Defendants also are liable for any other relief that will abate and remediate the nuisance and its short-term and long-term effects.

277. Corteva and New DuPont are successors to Old DuPont and thus liable on the State's nuisance claim on the separate and independent grounds that these defendants (i)

contractually assumed Old DuPont's PFAS-related liabilities, and (ii) participated in Old DuPont's fraudulent restructuring scheme.

**COUNT II.**
**NEGLIGENCE AND GROSS NEGLIGENCE**
**(AGAINST ALL DEFENDANTS)**

278. The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

279. Defendants had a duty to the State to ensure that PFAS were not released as a result of the use, storage, transport, and/or sale of their PFAS-containing Products, including AFFF Products, and to ensure that those products did not injure air, soil, sediment, biota, surface water, groundwater, drinking water, watercourses, wetlands, other natural resources, and property held in trust or otherwise owned by the State.

280. Defendants had a duty to the State to exercise due care in the research, design, formulation, handling, manufacture, marketing, sale, testing, labeling, use, distribution, promotion, and/or instructions for use of their PFAS-containing Products, including AFFF Products.

281. Defendants foreseeably put the State, its natural resources, and its residents at unreasonable risk of harm by manufacturing and selling their PFAS-containing Products, including AFFF Products.

282. Defendants breached these duties in that they negligently, carelessly, recklessly, willfully, and/or wantonly researched, designed, formulated, handled, manufactured, marketed, sold, tested, labeled, used, distributed, promoted, and/or instructed for use of their PFAS-containing Products, including AFFF Products, when they knew, or should have known, that PFAS

would (i) be released into the environment, and (ii) be released and contaminate the State's natural resources.

283. Despite their knowledge that contamination with PFAS was the inevitable consequence of their conduct as alleged herein, Defendants failed to fully research the effects of PFAS on human health and the environment and failed to provide reasonable warnings or special instructions, failed to take other reasonable precautionary measures to prevent or mitigate such contamination, and/or affirmatively misrepresented the hazards of PFAS in their AFFF Product information and/or instructions for use.

284. As a direct and proximate result of Defendants' negligent and/or grossly negligent manufacture and sale of PFAS-containing Products, including AFFF Products, as well as their failure to disclose the dangers to human health and the environment, the State has suffered monetary losses and damages in amounts to be proven at trial, including but not limited to investigation, remediation, treatment, monitoring, restoration, rehabilitation, and replacement costs and expenses for which Defendants are jointly and severally liable.

285. Hawai'i's natural resources belong to the public and are held in trust by the State.

286. As long as the State's natural resources remain contaminated with PFAS due to Defendants' conduct, the harm to the State continues.

287. Defendants acted with willful, wanton, or conscious disregard for the rights, health, and safety of the State's residents and the wellbeing of the State's natural resources, thereby entitling the State to an award of punitive damages.

288. Corteva and New DuPont are successors to Old DuPont and thus liable on the State's negligence and gross negligence claim on the separate and independent grounds that these

defendants (i) contractually assumed Old DuPont's PFAS-related liabilities, and (ii) participated in Old DuPont's fraudulent restructuring scheme.

**COUNT III.**
**STRICT LIABILITY (DESIGN DEFECT)**
**(AGAINST ALL DEFENDANTS)**

289. The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

290. Defendants manufactured PFAS and/or sold or supplied fluorochemicals and/or fluorosurfactants containing PFAS for use in PFAS-containing Products, including AFFF Products, and at all times had a duty to issue adequate warnings to the State, the public, consumers, and public officials of the reasonably foreseeable or knowable risks posed by their PFAS-containing Products.

291. Defendants designed, developed, manufactured, marketed, advertised, distributed, sold, released, supplied, used, and/or disposed of PFAS-containing Products, which were intended by Defendants to be used in a wide array of consumer and industrial products, including nonstick cookware, food packaging, stain resistant carpet and furniture, water resistant clothing, personal care products, and firefighting foam.

292. Defendants' PFAS-containing Products, including AFFF Products, were not reasonably safe as designed and have been unreasonably dangerous for their intended, foreseeable, and ordinary use and disposal.

293. Defendants' PFAS-containing Products, including AFFF Products, released PFAS into the environment, after which this PFAS migrated through the environment and contaminated natural resources.

294. Remediating and restoring natural resources contaminated with PFAS is difficult and costly.

295. PFAS released into the environment from Defendants' PFAS-containing Products, including AFFF Products, cause contamination in the environment, including in drinking water supplies, that endangers public health and safety and threatens natural resources.

296. Defendants marketed, promoted, sold and/or distributed PFAS-containing Products, including AFFF Products, to the State and consumers in Hawaiʻi while concealing the dangers of those products and affirmatively distorting and/or suppressing their knowledge and the scientific evidence linking their products to the unreasonable dangers those products pose.

297. Defendants expected that their PFAS-containing Products, would reach consumers or users without a substantial change in those products' condition; Defendants' PFAS-containing Products did reach consumers and/or users without a substantial change in those products' condition.

298. At all times relevant to this action, Defendants' PFAS-containing Products did not meet the reasonable expectations of an ordinary consumer or user as to those products' safety. In particular, ordinary consumers did not expect that PFAS-containing Products would, inter alia, threaten the viability of natural resources; endanger the public's health and safety by exposing them to chemicals known to cause significant diseases, including certain cancers; migrate through the environment; resist degradation; bioaccumulate; biomagnify; persist in the environment; or contaminate drinking water supplies.

299. At all times relevant to this action, the use of Defendants' PFAS-containing Products, including AFFF Products, in a reasonably foreseeable manner involved a substantial

danger that would not be readily recognized by the ordinary user and Defendants failed to give adequate warnings of that danger.

300. At all times relevant to this action, the foreseeable harm to the environment and public health and welfare posed by Defendants' PFAS-containing Products, including AFFF Products, outweighed the cost to Defendants of reducing or eliminating such harm.

301. At all times relevant to this action, Defendants knew or should have known about reasonably safer and feasible alternatives to their PFAS-containing Products, including AFFF Products, and the omission of such alternative designs rendered their PFAS-containing Products, including AFFF Products, not reasonably safe.

302. Defendants' PFAS-containing Products, including AFFF Products, caused and continue to cause injury to the State and consumers.

303. The State and consumers have been damaged and will continue to suffer damages as a result of Defendants' conduct.

304. Defendants acted with willful or conscious disregard for the rights, health, and safety of the State's residents and the wellbeing of the State's natural resources, thereby entitling the State to an award of punitive damages.

305. Corteva and New DuPont are successors to Old DuPont and thus liable on the State's design defect claim on the separate and independent grounds that these defendants (i) contractually assumed Old DuPont's PFAS-related liabilities, and (ii) participated in Old DuPont's fraudulent restructuring scheme.

**COUNT IV.**
**STRICT LIABILITY (FAILURE TO WARN)**
**(AGAINST ALL DEFENDANTS)**

306. The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

307. Defendants were required to warn the State and consumers of, inter alia, the dangers posed by their PFAS-containing Products, including AFFF Products, and the contamination that would result from those products' intended uses.

308. Defendants expected that their PFAS-containing Products would reach consumers and/or users without a substantial change in those products' conditions; and Defendants' PFAS-containing Products, including AFFF Products, did reach consumers and/or users without a substantial change in those products' conditions.

309. Defendants knew, or should have known, at the time they manufactured PFAS-containing Products, of the likelihood of harm to human health and the environment from their PFAS-containing Products, including AFFF Products, but they failed to warn, or inadequately warned of, inter alia, the likelihood that PFAS would be released into the environment during the normal use of Defendants' PFAS-containing Products, including AFFF Products, and of the widespread, toxic, and persistent effects of such releases.

310. Defendants failed to provide such warnings to the State and/or users and buyers of their PFAS-containing Products, including AFFF Products. Defendants' failure to issue the proper warnings relating to their PFAS-containing Products affected the market's acceptance of these products and prevented consumers from seeking alternative products.

311. Defendants knew or should have known that their marketing and promotional efforts were creating an untrue and misleading impression of the risks associated with their PFAS-

containing Products. Those false and misleading representations and omissions were material because they involve information that would be important to consumers and, therefore, likely their choice of, or conduct regarding, PFAS-containing Products.

312. To the extent Defendants provided any warnings about their products, they were not warnings that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger posed by PFAS-containing Products, including AFFF Products, and the warnings did not convey adequate information on the dangers of PFAS to the mind of a reasonably foreseeable or ordinary user or consumer. Moreover, the seriousness of the potential harms with respect to AFFF Products and other PFAS-containing Products rendered any such warnings inadequate.

313. Even if the likelihood of harm to human health and the environment from PFAS was not known to Defendants at the time they manufactured the PFAS-containing Products, including AFFF Products, Defendants learned or should have learned about the dangers connected with them after these products were manufactured, based on their internal studies, investigations, and subject-matter expertise. As such, after manufacturing their PFAS-containing Products, Defendants had a duty to act with regard to issuing warnings concerning the dangers associated with products, and a reasonably prudent manufacturer would have done so.

314. Despite the fact that Defendants knew or should have known about the risks associated with PFAS-containing Products, including AFFF Products, Defendants withheld such knowledge from the State, other government entities, and the public. Moreover, Defendants affirmatively distorted and/or suppressed their knowledge and the scientific evidence linking their products to the unreasonable dangers those products pose.

315. As a direct and proximate result of Defendants' failure to warn of the hazards of PFAS-containing Products, including AFFF Products, air, soil, sediment, biota, surface water, groundwater, drinking water, watercourses, wetlands, other natural resources, and/or property held in trust or otherwise owned by the State at and around various locations throughout the State where Defendants' PFAS-containing Products were transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and/or disposed have become contaminated with PFAS.

316. As a direct and proximate result of Defendants' acts and omissions, the State has incurred, is incurring, and will continue to incur in the future damages related to PFAS contamination in an amount to be proved at trial.

317. Defendants acted with conscious disregard for the dangerous consequences of their PFAS-containing Products' foreseeable impact on the State, thereby entitling the State to an award of punitive damages in an amount reasonable, appropriate, and sufficient to punish Defendants for the good of society and deter Defendants from ever committing the same or similar acts.

318. Corteva and New DuPont are successors to Old DuPont and thus liable on the State's failure to warn claim on the separate and independent grounds that these defendants (i) contractually assumed Old DuPont's PFAS-related liabilities, and (ii) participated in Old DuPont's fraudulent restructuring scheme.

**COUNT V.**
**TRESPASS**
**(AGAINST ALL DEFENDANTS)**

319. The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

320. Trespass is an unprivileged, intentional intrusion on land in the possession of another, which may arise from the release of chemicals causing contamination of the property.

321. At all pertinent times, the State had a possessory interest in and owned land in Hawaiʻi contaminated by Defendants' PFAS-containing Products, including AFFF Products, which caused and continue to cause PFAS contamination of the State's air, soil, sediment, biota, surface water, groundwater, drinking water, watercourses, wetlands, other natural resources, and property held in trust or otherwise owned by the State.

322. At all times relevant to the present cause of action, Defendants, as designers, manufacturers, marketers, and sellers of PFAS-containing Products, provided the PFAS-containing Products, including AFFF Products, that were used throughout the State that resulted in the contamination of air, soil, sediment, biota, surface water, groundwater, drinking water, watercourses, wetlands, other natural resources, and property held in trust or otherwise owned by the State.

323. Defendants have intentionally, recklessly, or negligently caused PFAS contamination to enter the property and natural resources throughout the State by designing, marketing, developing, distributing, selling, manufacturing, releasing, supplying, using, and/or disposing of PFAS-containing Products—all while knowing to a substantial certainty that the intended use of these PFAS-containing Products, including AFFF Products, would result in widespread PFAS contamination in the State.

324. Defendants affirmatively, unreasonably, voluntarily, and intentionally provided PFAS-containing Products to users and consumers in the State. It was reasonably foreseeable to Defendants that the introduction of PFAS-containing Products to Hawaiʻi could disturb the State's possessory interest over its natural resources, as large quantities of PFAS would and/or could be

introduced into the State's air, soil, sediment, biota, surface water, groundwater, drinking water, watercourses, wetlands, other natural resources, and property held in trust or otherwise owned by the State.

325. Defendants' acts or omissions caused PFAS to be released into the State's natural resources, thereby contaminating and injuring these resources. These acts or omissions wrongfully caused waste or injury to the State's lands. Moreover, at the time the Defendants' acts or omissions caused the contamination, waste, and injury to Hawai'i's lands, the Defendants knew, or should have known, they lacked any authorization to cause, or permit to be caused, PFAS contamination, waste, and injury to the State's public property.

326. The State has never consented to the trespass described herein.

327. Defendants have thus trespassed and are liable for all damages from that trespass, and the State is entitled to recover all such damages and other relief.

328. Corteva and New DuPont are successors to Old DuPont and thus liable on the State's trespass claim on the separate and independent grounds that these defendants (i) contractually assumed Old DuPont's PFAS-related liabilities, and (ii) participated in Old DuPont's fraudulent restructuring scheme.

**COUNT VI.**
**UNFAIR AND DECEPTIVE ACTS OR PRACTICES**
**(AGAINST ALL DEFENDANTS)**

329. The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

330. UDAP prohibits any person from engaging in unfair or deceptive acts or practices in the conduct of any trade or commerce in the State. HRS § 480-2(a).

331. Defendants are "persons" within the meaning of UDAP. *See* HRS § 480-1.

332. The residents of Hawai‘i who purchased, attempted to purchase, or were solicited to purchase PFAS-containing Products by Defendants are "consumers" within the meaning of UDAP. *See* HRS § 480-1.

333. Defendants conducted "trade" or "commerce" within the meaning of UDAP.

334. Defendants engaged in unfair and deceptive acts or practices within the meaning of HRS § 480-2 by, inter alia, claiming that their PFAS-containing Products were safe while misrepresenting and omitting risks and dangers associated with their PFAS-containing Products.

335. Defendants engaged in unfair and deceptive acts or practices within the meaning of HRS § 480-2 by, inter alia, failing to update their information and marketing materials with known, material risks associated with the use of PFAS-containing Products.

336. As alleged herein, these representations are deceptive and unfair because Defendants misrepresented material information as alleged in this Complaint to consumers and/or material information was omitted from informational and marketing materials.

337. Defendants' misrepresentations were deceptive because they had the capacity to mislead a substantial number of consumers acting reasonably under the circumstances.

338. Defendants' acts or practices as alleged in this Complaint were unfair because they offended public policy, were immoral, unethical, oppressive, or unscrupulous, and caused injury to consumers.

339. Defendants' acts and practices described in this Complaint violate HRS § 480-2.

340. Each day that Defendants violated HRS § 480-2 constitutes a separate violation. HRS § 480-3.1.

341. The State has been injured, directly and/or indirectly, by Defendants' unfair and deceptive acts and practices that were in violation of HRS § 480-2.

342. Corteva and New DuPont are successors to Old DuPont and thus liable on the State's UDAP claims on the separate and independent grounds that these defendants (i) contractually assumed Old DuPont's PFAS-related liabilities, and (ii) participated in Old DuPont's fraudulent restructuring scheme.

## VII. REQUEST FOR RELIEF

WHEREFORE, the State asks that this Court:

343. Find Defendants liable for all PFAS-related costs to investigate, test, clean up and remove, restore, treat, and monitor, and for such orders as may be necessary to provide full relief to address the threat of contamination to the State, including the costs of:

i. Past and future testing of natural resources at and around the sites throughout Hawai‘i where Defendants' PFAS-containing Products, including AFFF Products, were transported, stored, used, handled, released, spilled, and/or disposed of and, thus, likely caused PFAS contamination;

ii. Past and future treatment of all natural resources at and around the sites throughout Hawai‘i where Defendants' PFAS-containing Products, including AFFF Products, were transported, stored, used, handled, released, spilled, and/or disposed of and which contain detectable levels of PFAS until restored to non-detectable levels;

iii. Past and future monitoring of the State's natural resources at and around the sites throughout Hawai‘i where Defendants' PFAS-containing Products, including AFFF Products, were transported, stored, used, handled, released, spilled, and/or disposed of as long as there is a detectable presence of PFAS, and restoration of such natural resources to their pre-discharge condition;

iv. Providing water from an alternate source;

v. Installing and maintaining wellhead treatment;

vi. Installing and maintaining wellhead protection programs;

vii. Installing and maintaining early warning systems to detect PFAS before it reaches wells;

viii. Outreach, education, community engagement, and additional public health studies, assessments, and measures;

ix. Implementing biomonitoring programs for water, soil, air, and all other impacted environmental media in communities and other areas where surface water and/or groundwater sources have become contaminated by PFAS;

x. Collecting and safely disposing of existing AFFF from sites around the State;

xi. Designing, implementing, and operating biomonitoring programs and studies and costs to otherwise assess PFAS public health impacts for all residents of the State; and

xii. Otherwise responding to PFAS contamination resulting from Defendants' PFAS-containing Products, including AFFF Products, so the contaminated natural resources are restored to their original condition, or are replaced by reasonably equivalent resources;

344. Order Defendants to pay all damages to compensate the residents of the State for the lost use and value, including loss of tax revenue and other economic benefits, from the State's natural resources during all times of injury caused by PFAS;

345. Order Defendants to pay for all costs related to the collection, return, and/or disposal of existing stocks of Defendants' PFAS-containing Products, including AFFF Products;

346. Order past and future investigation, assessment, testing, treatment, and remediation of all PFAS-related contamination at sites where Defendants' PFAS-containing Products, including AFFF Products, were used or disposed of and which contain detectable levels of PFAS, so that those sites are restored to nondetectable levels, including the State's oversight costs;

347. Order future monitoring of the sites and the State's natural resources where Defendants' PFAS-containing Products, including AFFF Products, were used or disposed of as long as there is a detectable presence of PFAS, and order restoration of such natural resources to their pre-contamination condition, including the State's employees' time and associated costs;

348. Order Defendants to pay for all other damages sustained by the State in its sovereign, parens patriae, public trustee, land owner, and other capacities as a direct and proximate result of Defendants' acts and omissions alleged herein;

349. Order Defendants to reimburse the State for its costs of responding to PFAS contamination, without regard to fault, including but not limited to all costs to investigate, clean up, restore, treat, monitor, and otherwise respond to contamination of the State's natural resources, including the State's oversight costs, resulting from Defendants' PFAS-containing Products, including AFFF Products, so that such natural resources are remediated and restored to their original condition;

350. Order Defendants to abate the nuisance by investigating, cleaning up, restoring, treating, monitoring, and otherwise responding to contamination of the State's natural resources, including the State's oversight costs, resulting from Defendants' PFAS-containing Products, including AFFF Products, so that such natural resources are remediated and restored to their original condition;

351. Order Defendants to reimburse the State for its costs of abatement of the public nuisance, without regard to fault, including but not limited to all costs to investigate, clean up, restore, treat, monitor, and otherwise respond to contamination of the State's natural resources at and around the sites throughout the State where Defendants' PFAS-containing Products, including AFFF Products, were transported, stored, used, handled, released, spilled, and/or disposed of so that such natural resources are restored to their original condition;

352. Order Defendants to pay special damages to the State for public nuisance, funding its performance of any further assessment and compensatory restoration of any natural resource that has been, or may be, injured as a result of the transport, storage, use, handling, release, spilling, and/or disposal of Defendants' PFAS-containing Products, including AFFF Products, and order Defendants to compensate the citizens of the State for the costs of restoration and replacement, including lost use and value, of any injured natural resource;

353. Find and declare that the State has conferred a benefit onto Defendants in the form of costs incurred responding to PFAS contamination resulting from Defendants' PFAS-containing Products, including AFFF Products, and that Defendants have been unjustly enriched by Defendants' practice of externalizing the costs associated with PFAS contamination onto the State;

354. Order Defendants to pay treble damages under UDAP, HRS § 480-14(a);

355. Order Defendants to pay a civil penalty of $500 to $10,000 per violation under UDAP, HRS § 480-3.1;

356. Order Defendants to pay restitution to the State;

357. Order Defendants to disgorge all ill-gotten gains;

358. Award the State punitive damages in an amount to be determined by the trier of fact;

359. Award the State costs and fees in this action, including reasonable attorneys' fees incurred in prosecuting this action, and the State's investigation costs together with prejudgment interest, to the full extent permitted by law;

360. Enjoin Defendants from further actions that will damage the State through the use of PFAS in any way; and

361. Award the State such other relief as this Court deems just and proper.

**REQUEST FOR JURY TRIAL**

The State hereby demands a jury trial on all causes of action for which a jury is available under the law.

RESPECTFULLY SUBMITTED this fourteenth day of December, 2023.

Dated: December 14, 2023
Honolulu, Hawai'i

ANNE E. LOPEZ
Attorney General of Hawai'i

*/s/ Wade H. Hargrove, III*

MELISSA J. KOLONIE
Supervising Deputy Attorney General
WADE H. HARGROVE, III
JOANNA B. K. F. YEH
Deputy Attorneys General
Department of the Attorney General
State of Hawai'i
425 Queen Street
Honolulu, Hawai'i 96813
Telephone: (808) 587-3050
Facsimile: (808) 587-3077
Email: Wade.H.Hargrove@hawaii.gov

MATTHEW K. EDLING (*pro hac vice* forthcoming)
STEPHANIE D. BIEHL (*pro hac vice* forthcoming)
ASHLEY B. CAMPBELL (*pro hac vice* forthcoming)
WILLIAM LIANG (# 11790)
**SHER EDLING LLP**
100 Montgomery St. Ste. 1410
San Francisco, CA 94104
Telephone: (628) 231-2500
Facsimile: (628) 231-2929
Email: matt@sheredling.com
stephanie@sheredling.com
ashley@sheredling.com
william@sheredling.com

WILLIAM J. JACKSON (*pro hac vice* forthcoming)
JOHN D.S. GILMOUR (*pro hac vice* forthcoming)
LANA ROWENKO (*pro hac vice* forthcoming)
LAUREN H. SHAH (*pro hac vice* forthcoming)
**KELLEY DRYE & WARREN LLP**
515 Post Oak Blvd., Suite 900
Houston, TX 77027
Telephone: (713) 355-5000
Facsimile: (713) 355-5001
Email: bjackson@kelleydrye.com
jgilmour@kelleydrye.com
lrowenko@kelleydrye.com
lshah@kelleydrye.com

DAVID ZALMAN (*pro hac vice* forthcoming)
ELIZABETH KRASNOW (*pro hac vice* forthcoming)
DAVID M. REAP (*pro hac vice* forthcoming)
ZOE MAKOUL (*pro hac vice* forthcoming)
**KELLEY DRYE & WARREN LLP**
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Telephone: (212) 808-7800
Facsimile: (212) 808-7897
Email: dzalman@kelleydrye.com
ekrasnow@kelleydrye.com
dreap@kelleydrye.com
zmakoul@kelleydrye.com

ROBERT A. BILOTT (*pro hac vice* forthcoming)
**TAFT STETTINIUS & HOLLISTER LLP**
425 Walnut Street, Suite 1800
Cincinnati, OH 45202-3957
Telephone: (513) 381-2838
Facsimile: (513) 381-0205
Email: bilott@taftlaw.com

DAVID J. BUTLER (*pro hac vice* forthcoming)
**TAFT STETTINIUS & HOLLISTER LLP**
65 East State Street, Suite 1000
Columbus, Ohio 43215
Telephone: (614) 221-2838
Facsimile: (614) 221-2007
Email: dbutler@taftlaw.com

*Attorneys for the State of Hawai'i*

**STATE OF HAWAI'I**
CIRCUIT COURT OF THE FIRST CIRCUIT

**SUMMONS**
TO ANSWER CIVIL COMPLAINT / ____________________

CASE NUMBER

PLAINTIFF'S NAME & ADDRESS, TEL. NO.

THE STATE OF HAWAI'I, ex. rel., ANNE E. LOPEZ, ATTORNEY GENERAL
425 Queen Street
Honolulu, Hawai'i 96813
Telephone: (808) 587-3050
Facsimile: (808) 587-3077

| PLAINTIFF VS. | DEFENDANT(S) |
|---|---|
| THE STATE OF HAWAI'I, ex. rel., ANNE E. LOPEZ, ATTORNEY GENERAL | 3M COMPANY; AGC CHEMICALS AMERICAS, INC.; ARCHROMA U.S., INC.; ARKEMA INC.; BASF CORPORATION; BUCKEYE FIRE EQUIPMENT COMPANY; CHEMDESIGN PRODUCTS, INC.; CHEMGUARD, INC.; CLARIANT CORPORATION; CORTEVA, INC.; DUPONT DE NEMOURS, INC.; DYNAX CORPORATION; EIDP, INC., F/K/A E.I. DU PONT DE NEMOURS AND COMPANY; THE CHEMOURS COMPANY; TYCO FIRE PRODUCTS LP; and ABC CORPORATIONS 1-10 (Names Fictitious) |

**TO THE ABOVE-NAMED DEFENDANT(S)**

You are hereby summoned and required to filed with the court and serve upon:

The State of Hawai'i, ex. rel., Anne E. Lopez, Attorney General
Wade H. Hargrove, III, Department of the Attorney General, 465 South King Street, Room 200, Honolulu, Hawai'i 96813

____________________,

plaintiff, as indicated above/whose address is stated above, an Answer to the Complaint / ____________________, which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the date of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

**THIS SUMMONS SHALL NOT BE PERSONALLY DELIVERED BETWEEN 10:00 P.M. AND 6:00 A.M. ON PREMISES NOT OPEN TO THE GENERAL PUBLIC, UNLESS A JUDGE OF THE ABOVE-ENTITLED COURT PERMITS, IN WRITING ON THIS SUMMONS, PERSONAL DELIVERY DURING THOSE HOURS.**

**A FAILURE TO OBEY THIS SUMMONS MAY RESULT IN AN ENTRYOF DEFAULT AND DEFAULT JUDGMENT AGAINST THE DISOBEYING PERSON OR PARTY.**

The original document is filed in the Judiciary's electronic case management system which is accessible via eCourt Kokua at: http:/www.courts.state.hi.us

**Effective Date of 1-DEC-2021**
**Signed by: /s/ Patsy Nakamoto**
**Clerk, 1st Circuit, State of Hawai'i**

If you need an accommodation for a disability when participating in a court program, service, or activity, please contact the ADA Coordinator of the XX Circuit as soon as possible to allow the court time to provide an accommodation. Phone No. 808-539-4400, TTY 808-539-4853, FAX 808-539-4402 or Send an e-mail to: adarequest@courts.hawaii.gov. The court will try to provide, but cannot guarantee, your requested auxiliary aid, service or accommodation.